UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| BENEFITALIGN, LLC<br>2400 Louisiana Blvd NE, Bldg 3,<br>Albuquerque, NM 87110;<br><br>AND<br><br>TRUECOVERAGE, LLC<br>2400 Louisiana Blvd NE, Bldg 3,<br>Albuquerque, NM 87110,<br><br>    Plaintiffs,<br><br> v.<br><br>CENTERS FOR MEDICARE AND<br>MEDICAID SERVICES<br>7500 Security Boulevard, Baltimore, MD<br>21244;<br><br>XAVIER BECERRA, in his official capacity<br>as Secretary of Health and Human Services<br>200 Independence Avenue SW, Washington,<br>DC 20201;<br><br>THE U.S. DEPARTMENT OF HEALTH<br>AND HUMAN SERVICES<br>200 Independence Avenue SW, Washington,<br>DC 20201;<br><br>CHIQUITA BROOKS-LASURE, in her<br>official capacity as Administrator of the<br>Centers for Medicare & Medicaid Services<br>7500 Security Boulevard, Baltimore, MD<br>21244;<br><br>    Defendants. | Case No.: 1:24-cv-02494-JEB |

**FIRST AMENDED COMPLAINT**

  Plaintiffs Benefitalign, LLC and TrueCoverage, LLC ("Plaintiffs") bring this civil action against the above-listed Defendants for declaratory and injunctive relief and allege as follows:

## INTRODUCTION

1.      One of the core provisions of the Affordable Care Act ("ACA") is the requirement that the Secretary ("Secretary") of Health and Human Services ("HHS") "establish procedures under which a State may allow agents or brokers . . . to enroll individuals and employers in any qualified health plans . . . offered through an Exchange" and "to assist individuals in applying for premium tax credits and cost-sharing reductions for plans sold through an Exchange." 42 U.S.C. § 18032(e).  As explained by the Centers for Medicare and Medicaid Services ("CMS"), the HHS component that oversees the administration of exchanges under the Affordable Care Act,

> The primary goal of the Patient Protection and Affordable Care Act (Affordable Care Act) is to broaden access to health insurance coverage.  To achieve this goal, the Affordable Care Act provides a premium tax credit to help subsidize coverage, gives consumers tools to make informed choices about their health care coverage, and puts in place strong consumer protections.  <u>Agents and brokers play an integral role in helping individuals understand and act on the coverage protections that the Affordable Care Act offers</u>.

*Welcome to the Affordable Care Act Basics Module*, CMS, 2 (2021), https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/affordable%20care%20act%20basics_112.pdf (emphasis added).

2.      However, HHS through its component, CMS, has acted to undermine the ability of brokers and agents to enroll eligible individuals and help them apply for premium tax credits by arbitrarily suspending Plaintiffs, who operate long-standing and well-established businesses that allow brokers and consumers to access, complete, and manage applications for affordable healthcare plans.

3.      In violation of its own regulations, HHS, through CMS, suspended Plaintiffs for no reason that complies with the government's own regulations, or commonsense.  After Plaintiffs filed this action, and almost a month after instituting their suspension, Defendants

issued a *post hoc* justification that discussed a litany of "concerns," "suspicions," "allegations," and something it "reasonably believes" about possible overseas access to CMS data. But these intimations of violations are made without evidence of any actual violation, and the few facts recited in support of them are entirely innocuous and commonplace aspects of "a hybrid onsite/offshore delivery model, which means that a portion of the software development work and IT support is conducted from overseas locations," which CMS admits "is acceptable, provided that CMS data and consumer PII reside in the United States." CMS even asserts that use of a Virtual Private Network (VPN) is suspicious, seemingly oblivious to the fact that VPN usage is so commonplace that CMS itself maintains a web page intended to "assist you with remotely accessing the Centers for Medicare & Medicaid Services (CMS) network infrastructure . . . through a Virtual Private Network (VPN)." *See Getting Started with Remote Access to the CMS Network*, CMS, https://www.cms.gov/files/document/getting-started-remote-access-1pdf (last visited Sept. 5, 2024).

4. If allowed to stand, HHS's arbitrary decision will prevent Plaintiffs from participating in the open enrollment period set to begin on November 1, 2024. If Plaintiffs are unable to participate, it will harm not only Plaintiffs but the thousands of brokers and consumers who use Plaintiffs' platforms and website and the millions of consumers who count on brokers using Plaintiffs' platforms to obtain insurance under the ACA. And it will send a chilling message to anyone who has invested in businesses that serve ACA markets: you could be next.

5. The suspension decision is lawless in at least three ways: HHS has (1) violated its own regulations governing suspension, which violates the Administrative Procedure Act ("APA"); (2) acted in an arbitrary and capricious manner, which also violates the APA; and (3) violated the Due Process Clause of the Constitution. Facing a lawless decision that threatens

to put them out of business, and that threatens substantial harm to consumers, brokers, agencies, and carriers alike, Plaintiffs seek injunctive and declaratory relief.

## PARTIES

6. Plaintiff Benefitalign, LLC ("Benefitalign") is a limited liability company formed under New Mexico law with its principal place of business in New Mexico. Benefitalign is located at 2400 Louisiana Blvd NE, Bldg 3, Albuquerque, NM 87110. Benefitalign is a CMS-approved "enhanced direct enrollment entity," which allows brokers, agencies, and consumers to search for, apply for, and manage subsidized healthcare plans under the ACA. Benefitalign has been a Direct Enrollment/Enhanced Direct Enrollment ("DE/EDE") approved entity with CMS since at least 2017, and as such is one of the oldest approved DE/EDE partners. Benefitalign provides its technology on a "white label" basis so that other participants in ACA marketplaces, such as agents and brokers, can help customers obtain health-insurance quotes and enroll in policies with insurance companies. During the past open enrollment season (November 2023 through January 2024), Benefitalign's Enhanced Direct Enrollment platform accounted for at least 1.2 million ACA applications, making it the second largest channel for ACA enrollments.

7. Plaintiff TrueCoverage, LLC ("TrueCoverage") is a limited liability company formed under Delaware law with its principal place of business in New Mexico. TrueCoverage is located at 2400 Louisiana Blvd NE, Bldg 3, Albuquerque, NM 87110. TrueCoverage is a private health insurance marketplace for individuals, families, and employers. It is a "One-Stop-Insurance-Shop" where consumers and agents (on behalf of consumers) can shop, compare, and enroll in affordable health insurance plans. TrueCoverage offers insurance plans from more than 600 top carriers across the country. TrueCoverage is an approved web-broker pursuant to 45 C.F.R. § 155.220. In addition, operating under the brand name "Inshura," TrueCoverage uses

the Benefitalign platform to offer a white-labeled quoting and enrollment platform to insurance agencies and agents/brokers.

8. Defendants are officials of the United States government and United States governmental agencies responsible for suspending Plaintiffs' ability to access the CMS systems necessary for their business operations.

9. Defendant Xavier Becerra is the Secretary of Health and Human Services. He oversees, among other things, CMS. He is sued in his official capacity. The office of the Secretary is located at 200 Independence Avenue SW, Washington, DC 20201.

10. Defendant United States Department of Health and Human Services is an executive department of the United States Government headquartered in Washington, D.C., and responsible for CMS. It is located at 200 Independence Avenue SW, Washington, DC 20201.

11. Defendant Chiquita Brooks-LaSure is the CMS Administrator. She administers CMS on behalf of the Secretary. She is sued in her official capacity. The office of the CMS Administrator is located at 7500 Security Boulevard, Baltimore, MD 21244.

12. Defendant Centers for Medicare & Medicaid Services ("CMS") is an administrative agency within HHS that is headquartered in Baltimore County, MD, and oversees the operations of the ACA marketplaces. It is located at 7500 Security Boulevard, Baltimore, MD 21244.

**JURISDICTION AND VENUE**

13. This Court has subject-matter jurisdiction over this case because it arises under the Constitution and laws of the United States. *See* 28 U.S.C. §§ 1331, 1346, 1361; 5 U.S.C. §§ 701–06. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief under 28

U.S.C. §§ 2201–02, 5 U.S.C. §§ 705–06, and its inherent equitable powers.

14. Defendants' suspension of Plaintiffs constitutes a final agency action that is judicially reviewable under the Administrative Procedure Act ("APA"). 5 U.S.C. §§ 704, 706.

15. Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because (1) Defendants are United States agencies or officers sued in their official capacities, (2) the Department of Health and Human Services is headquartered in this District, (3) no real property is involved, and (4) a substantial part of the events or omissions giving rise to the Complaint occurred within this judicial district.

## BACKGROUND

### I. The Affordable Care Act

16. The ACA is intended to make health insurance more accessible through the creation of a marketplace that allows people to compare and purchase health insurance plans. The ACA marketplace includes a federal exchange, accessible at healthcare.gov, and state-based exchanges. Both allow consumers to compare and purchase plans.

17. The ACA also provides for financial assistance in certain circumstances, through premium tax credits and cost-sharing reductions. Agents and brokers help consumers compare and apply for health insurance and for financial assistance. Agents and brokers can help customers interact with the exchanges via processes called Direct Enrollment or Enhanced Direct Enrollment. Under Direct Enrollment, consumers start on the web page of an insurer or broker, begin the application process there, are redirected to CMS's healthcare.gov to complete eligibility determination, and are then redirected back to the insurer or broker to finish the process. Under Enhanced Direct Enrollment, the consumer interacts directly with the insurer or broker, which in turn interacts with CMS through secure application program interfaces. In

either case, the broker or insurer must exchange information with CMS in order to participate in the system.

### II.     The Suspension Decision

18.     After business hours on August 8, 2024, at 6:37 P.M., an official at CMS sent the following two-sentence email to Benefitalign and Inshura: "CMS is suspending EDE/DE/EBP access for Inshura/TrueCoverage and Benefitalign due to potential anomalous activity. CMS will follow up with additional communication to provide next steps." CMS offered no other reason for, or information about, its decision.

19.     That very evening, the Benefitalign and Inshura platforms lost Enhanced Direct Enrollment functionality. As a result, certain insurance carriers and over 5,000 agents and agencies can no longer use the EDE platform to perform their basic business of helping customers shop for and enroll in ACA health insurance plans. A number of affected agencies and agents have already left the Benefitalign and Inshura platforms, and unless access to the EDE platform is reinstated, Benefitalign and Inshura are likely to see a mass exodus of their remaining agencies and agents.

20.     Despite the loss of access and resulting loss of business relationships, Plaintiffs engaged with CMS. Plaintiffs provided information to CMS in response to CMS inquiries over a period of almost three weeks, in hopes of resolving the issue quickly. Plaintiffs answered questions that CMS proposed in writing. *Id*. Plaintiffs also offered to meet with CMS via phone call or video conference. *Id*. Plaintiffs fully cooperated with CMS.

21.     Unable to obtain from CMS any account of what CMS thinks they did wrong, or what might satisfy CMS, Plaintiffs reluctantly sought Court relief on August 28, 2024. On Labor Day, September 2, 2024, CMS responded with a *post hoc* justification ("Suspension Notice") for the suspension and announced its decision to continue the suspension indefinitely,

pending the conclusion of an audit that, as of the filing of this Complaint, it has still not even commenced. CMS also expanded the suspension to cover not just Plaintiffs' platforms, but also TrueCoverage's web-broker activities. *Id*. at 1.

22. Plaintiffs file this Amended Complaint to take into account the new claims made in the Labor Day Suspension Notice.

### III.  CMS Violated its Own Regulations.

23. CMS claims to impose the suspension "[p]ursuant to 45 C.F.R. §§ 155.220(c)(4)(ii) and 155.221(e)." *Id.* at 1. The former purports to authorize suspension of a web broker "if HHS discovers a security and privacy incident or breach . . . ." 45 C.F.R. § 155.220(c)(4)(ii). The latter purports to allow the suspension of a direct-enrollment entity "if HHS discovers circumstances that pose unacceptable risk to the accuracy of the Exchange's eligibility determinations, Exchange operations, or Exchange information technology systems until the incident or breach is remedied or sufficiently mitigated to HHS' satisfaction." 45 C.F.R. § 155.221(e).

24. Neither the original email claiming "potentially anomalous activity" nor the later Suspension Notice satisfy either regulation. Because no relevant regulation authorizes suspension on CMS's stated bases, the decision is unlawful under HHS's own regulations.

### IV.  The Suspension and the Regulations that Purportedly Authorize it, as Construed by HHS, Are Arbitrary, Capricious, and Contrary to the Affordable Care Act's Purpose.

25. CMS offered no adequate reason for the suspension. The Suspension Notice cites a litany of fears, suspicions and possibilities, the unsupported allegations of civil litigation at its earliest stages, commonplace facts about reliance on Indian IT resources for system other than the EDE Platform, and practices as ubiquitous as the use of a VPN and corporate internet

communications with a variety of international cites on the world-wide web.  It cites virtually no facts about the EDE Platform itself.

26. To the extent CMS construes the regulatory standards for suspension to allow suspension on such bases, the regulations are not reasonably calculated to give notice to participants of the facts that might lead to suspension or to meaningfully guide or constrain suspension decisions.

27. To the extent HHS has attempted to authorize itself to suspend direct enrollment entities and/or web-brokers for any or no reason through the adoption of purposely ambiguous regulations, it has acted arbitrarily and capriciously in their promulgation.

28. Moreover, a purposely arbitrary and standardless suspension regime undermines Congress's directive to the Secretary to "establish procedures under which a State may allow agents or brokers . . . to enroll individuals and employers in any qualified health plans . . . offered through an Exchange" and "to assist individuals in applying for premium tax credits and cost-sharing reductions for plans sold through an Exchange."  42 U.S.C. § 18032(e)(1)–(2).

**V.      Irreparable Harm to Plaintiffs**

29. Plaintiffs' businesses serve critical functions in the health insurance marketplace and are essential to the companies' ongoing operations.  The CMS suspension threatens practically all of the revenue generated by TrueCoverage, Benefitalign, and TrueCoverage's Inshura platform.  Benefitalign's platform is known as "Benefitalign BrokerEngage$^{TM}$ - Primary EDE Host."  TrueCoverage, through its "Inshura" brand, has CMS approval to offer a free, white-labelled health plan-quoting and enrollment version of Benefitalign's EDE Platform to agencies and agents/brokers.  TrueCoverage d/b/a Inshura markets this offering as the Inshura EDE Platform.  (We refer to the platforms as, collectively, the EDE Platform).

30.     The EDE Platform forms the foundation for brokers and agencies to sell healthcare plans to new customers and serve existing customers.  In the weeks that have passed since the CMS suspension, brokers who use the Benefitalign and Inshura platforms have left Plaintiffs' EDE Platform.  Without a functioning platform, brokers are unable conduct business and meet their sale and service needs, resulting in substantial and overwhelming loss of revenue to Benefitalign and TrueCoverage.  This loss will be permanent if the access to the platform is not restored now, well in advance of the November 2024 open enrollment period.  Brokers face considerable transition costs for switching EDE platforms, as their systems are closely integrated with their platform of choice.  The same is true for the health insurance carriers, such asAvMed, that use the Benefitalign and Inshura platforms and whose operations are severely affected by the suspension of these platforms.  Here too, carriers are likely to terminate their relationship with Benefitalign and Inshura and incur the cost of transitioning to an alternative platform if the Plaintiffs are unable to participate in open enrollment.

31.     TrueCoverage, as a web-broker, faces the same predicament as the third-party brokers and carriers who are harmed by the suspension of Benefitalign and Inshura, as TrueCoverage also uses the Benefitalign platform to enroll new customers and service existing customers.  TrueCoverage has approximately 150,000 customers and receives approximately 300 service calls each day.  As long as the platforms remain non-functional, TrueCoverage cannot perform these functions, resulting in an inability to service existing customers, a current loss of revenue, and a devasting ongoing loss of revenue associated with the open enrollment period.  Maintaining a suspension of TrueCoverage's web-broker activities will only exacerbate these effects, even if the EDE Platform is reinstated.

32. In short, the CMS suspension jeopardizes practically all the revenue upon which Plaintiffs depend to function. Ongoing suspension will have calamitous effects on Plaintiffs' ability to stay in business.

## VI. Implications for Americans Seeking Healthcare

33. The suspension harms parties other than Plaintiffs. The carriers, agents, and brokers whose systems are integrated with CMS through Plaintiffs' systems are essentially frozen out of CMS. Hundreds of thousands of individual customers are also affected. When they contact their carriers or brokers for basic account needs, like confirming coverage at a doctor's office, trying to add a new family member to a plan, or submitting requested documentation, they cannot now do so if their carriers, brokers, or agents are themselves integrated with Plaintiffs' systems. When new customers want to seek insurance in the upcoming enrollment period, they will not have the option of working with Plaintiffs and the brokers who use the Plaintiffs platform. These innocent third parties are unintended but obviously foreseeable victims of Defendants' cavalier decision.

## CLAIMS FOR RELIEF

### COUNT I
### The Suspension Violates the Administrative Procedure Act

34. Plaintiffs repeat and incorporate by reference Paragraphs 1 through 33 of the Complaint's allegations stated above.

35. The suspension violates the APA in two ways: the agency action was not in accordance with law or with procedure required by law, and it was arbitrary and capricious.

36. The APA provides that courts must "hold unlawful and set aside agency action" that is "not in accordance with law" or is "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

37. Furthermore, an agency "is not free to ignore or violate its regulations while they remain in effect." *Elevance Health, Inc. v. Becerra*, No. CV 23-3902 (RDM), 2024 WL 2880415, at *9 (D.D.C. June 7, 2024) (quoting *U.S. Lines, Inc. v. Fed. Mar. Comm'n*, 584 F.2d 519, 526 n.20 (D.C. Cir. 1978)).

38. Defendants have not complied with any of the regulations that might provide for suspension of direct-enrollment entities.

39. Accordingly, the suspension violates HHS's own regulations, is not in accordance with law, and is without observance of procedure required by law. Under the APA, a court must also "hold unlawful and set aside agency action" that is arbitrary or capricious or otherwise not in accordance with law or contrary to the Constitution. 5 U.S.C. § 706(2)(A).

40. The Supreme Court has "frequently reiterated that an agency must cogently explain why it has exercised its discretion in a given manner . . . ." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983). And, a corollary rule is that a court "must reverse an agency policy when [it] cannot discern a reason for it." *Judulang v. Holder*, 565 U.S. 42, 64 (2011).

41. "[A]gency action is lawful only if it rests on a consideration of the relevant factors" and "important aspect[s] of the problem." *Michigan v. EPA*, 576 U.S. 743, 750–52 (2015) (internal quotation marks omitted) (requiring "reasoned decisionmaking"). This means agencies must "examine all relevant factors and record evidence." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017).

42. It also means that an agency cannot "entirely fail[ ] to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *see also Am. Wild Horse*, 873 F.3d at 931 ("[T]he Service's Finding of No Significant Impact not only failed to take a

12

'hard look' at the consequences of the boundary change, it averted its eyes altogether."); *Gresham v. Azar*, 363 F. Supp. 3d 165, 177 (D.D.C. 2019) ("The bottom line: the Secretary did no more than acknowledge—in a conclusory manner, no less—that commenters forecast a loss in Medicaid coverage.").

43. The suspension decision is arbitrary and capricious for three independently sufficient reasons.

44. First, as explained above, the reasons Defendants have provided for the suspension are disconnected from the EDE Platform that is the focus of the relevant substantive requirements and reflect irrational fears and suppositions from common business structures and practice related to other of Plaintiffs' systems. Defendants have justified expanding the suspension to cover TrueCoverage's web-broker activities by citing unproven allegations from the Complaint in a court action where responses are not even yet due.

45. Second, if the regulations governing suspension are themselves so vague as attempt to authorize suspension on these bases, then they invite and encourage exactly the kind of arbitrary and capricious decision-making that Defendants have made in this case. An agency decision is arbitrary and capricious when "at base everything hangs on the fortuity of an individual official's decision." *Judulang*, 565 U.S. at 58.

46. Third, the decision to suspend fails to consider an important aspect of the problem: participation in the ACA system will be deterred once other enrollment platform providers, brokers, agents, and carriers learn that CMS can and will simply turn off access for hundreds of thousands of insured customers for reasons such as these. This undermines rather than serves the statutory requirement to establish procedures to allow agents and brokers to enroll eligible participants. *See* 42 U.S.C. § 18032(e).

13

47.     For each of these independently sufficient reasons, the suspension decision violates the Administrative Procedures Act because it is arbitrary and capricious.

## COUNT II
**The Suspension Violates the Due Process Clause of the Constitution**

48.     Plaintiffs repeat and incorporate by reference all the Complaint's allegations stated above.

49.     The Constitution of the United States provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law . . . ." U.S. CONST. amend. V.

50.     Plaintiffs have a property interest in their businesses as ongoing, viable entities.

51.     By preventing Plaintiffs from accessing the ACA Exchanges, Defendants threaten to deprive Plaintiffs of that interest in its entirety.

52.     By suspending Plaintiffs without meaningful notice or opportunity to address any concerns, CMS has created substantial risk of erroneously depriving Plaintiffs of their businesses.

53.     Providing Plaintiffs with prior notice and a realistic opportunity to cure would be a substantially more valuable procedure than summarily suspending Plaintiffs without any explanation and would mitigate the risk of an erroneous deprivation of Plaintiffs' property.

54.     Providing Plaintiffs with prior notice and a realistic opportunity to cure would be a minimally burdensome procedure for CMS to implement.

55.     By threatening to put Plaintiffs out of business before disclosing the factual basis for the action, by issuing the arbitrary and unreasonable *post hoc* suspension rationale, and by failing to provide a meaningful opportunity to rebut it, Defendants have deprived Plaintiffs of property in a manner that violates the Due Process Clause of the Constitution.

## PRAYER FOR RELIEF

**NOW, THEREFORE,** Plaintiffs request an order and judgment:

1. Declaring, under 28 U.S.C. § 2201, that the suspension violates HHS regulations and is thus contrary to law under the APA;

2. Declaring, under 28 U.S.C. § 2201, that Defendants' decision to suspend Plaintiffs' access to ACA marketplaces is arbitrary and capricious and thus unlawful under the APA;

3. Declaring, under 28 U.S.C. § 2201, that Defendants' decision to suspend Plaintiffs' access to ACA marketplaces violates the Due Process Clause of the Fifth Amendment to the U.S. Constitution;

4. Preliminarily and permanently enjoining, without bond, Defendants from suspending Plaintiffs from participation in ACA marketplaces;

5. Granting all other relief to which Plaintiff states are entitled, including but not limited to attorneys' fees and costs.

Dated:  September 6, 2024

Respectfully submitted,

/s/ *Amy E. Richardson*
Amy E. Richardson, Esq. (DC Bar # 472284)
Patrick P. O'Donnell, Esq. (DC Bar # 459360)
Walter E. Anderson, Esq. (DC Bar # 975456)
HWG LLP
1919 M Street NW, 8th Floor
Washington, DC 20036
Tel.:  202-730-1329
Email:  arichardson@hwglaw.com

*Counsel for Plaintiffs Benefitalign, LLC and TrueCoverage, LLC*