UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BENEFITALIGN, LLC, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>CENTERS FOR MEDICARE & MEDICAID SERVICES, et al.,<br><br>Defendants. | Civil Action No. 24-2494 (JEB) |

**DEFENDANTS' COMBINED MOTION TO DISMISS AND OPPOSITION TO PLAINTIFFS' AMENDED MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION, AND REQUEST FOR EXPEDITED HEARING <u>AND MEMORANDUM IN SUPPORT THEREOF</u>**

**TABLE OF CONTENTS**

Table of Contents............................................................................................................... i

Table of Authorities .......................................................................................................... ii

Introduction........................................................................................................................ 1

Statutory and Reguatory Background............................................................................... 3

    I.    Web-Brokers, Enhanced Direct Enrollment Entities, Direct Enrollment Entities, and Their Participation in the Exchanges Under the Affordable Care Act............. 3

    II.    Oversight, Enforcement, and Rebuttal Opportunity ................................................ 8

Factual and Procedural Background ................................................................................. 11

Legal Standards................................................................................................................ 14

    **I.**    Rule 12(b)(1)............................................................................................................ 14

    II.    Rule 12(b)(6)............................................................................................................ 14

    III.    Preliminary Injunction ............................................................................................ 15

Argument ......................................................................................................................... 16

    I.    This Action Should Be Dismissed for Lack of Jurisdiction. ............................... 16

        A.    Any Claims Related to the August 8 Email Are Moot. ........................... 16

        B.    Plaintiffs' Claims Are Not Ripe............................................................... 18

        C.    Plaintiffs' Other Assertions of Jurisdiction Also Fail.............................. 21

    II.    This Action Should Also Be Dismissed for Failure to State a Claim................... 22

        A.    Plaintiffs Do Not Have a Viable APA Claim. ......................................... 22

        B.    Plaintiff's Fifth Amendment Due Process Claim is Legally Deficient..... 30

    III.    Even If the Court Does Not Dismiss This Lawsuit, Plaintiffs Are Not Entitled to a Temporary Restraining Order or Preliminary Injunction. .................................... 33

        A.    Plaintiffs Have Not Established Irreparable Injury.................................. 33

        B.    Plaintiffs Are Unlikely to Succeed on the Merits. ................................... 39

        C.    The Remaining Factors Weigh Against Mandatory Injunction................ 39

Conclusion ....................................................................................................................... 41

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page**

*13th Reg'l Corp., v. Dep't of Interior*,
   654 F.2d 758 (D.C. Cir. 1980) .......................................................................... 21

*Already, LLC v. Nike, Inc.*,
   568 U.S. 85 (2013) ........................................................................................ 17

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.*,
   271 F.3d 262 (D.C. Cir. 2001) ........................................................................ 22

*Am. Nat'l Ins. Co. v. FDIC*,
   642 F.3d 1137 (D.C. Cir. 2011) ...................................................................... 14

*Apex, Inc. v. FDA*,
   449 F.3d 1249 (D.C. Cir. 2006) ...................................................................... 39

*Arpaio v. Obama*,
   797 F.3d 11 (D.C. Cir. 2015) .......................................................................... 38

*Asante v. Azar*,
   436 F. Supp. 3d 215 (D.D.C. 2020) ............................................................... 18

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ........................................................................... 14, 15, 31

*Atherton v. D.C. Off. of the Mayor*,
   567 F.3d 672 (D.C. Cir. 2009) ........................................................................ 31

*Belmont Abbey Coll. v. Sebelius*,
   878 F. Supp. 2d 25 (D.D.C. 2012) ................................................................. 20

*Biovail Corp. v. FDA*,
   448 F. Supp. 2d 154, (D.D.C. 2006) .............................................................. 39

*Blue Water Balt. v. Pruitt*,
   266 F. Supp. 3d 174 (D.D.C. 2017) ............................................................... 18

*Burke v. Barnes*,
   479 U.S. 361 (1987) ................................................................................... 16-17

*C&E Servs., Inc. v. D.C. Water & Sewer Auth.*,
   310 F.3d 197 (D.C. Cir. 2002) ........................................................................ 21

*California v. Texas*,
   593 U.S. 659 (2021) ........................................................................................ 21

*Chaplaincy of Full Gospel Churches v. England*,

454 F.3d 290 (D.C. Cir. 2006) ........................................................................................... 15

*Cheney v. U.S. Dist. Ct. for Dist. Of Columbia*,
    542 U.S. 367 (2004) ...................................................................................................... 21

*City of Columbus v. Trump*,
    453 F. Supp. 3d 770 (D. Md. 2020) .............................................................................. 3

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ...................................................................................................... 38

*Colo. Wild Horse v. Jewell*,
    130 F. Supp. 3d 205 (D.D.C. 2015) .............................................................................. 39

*D&G Holdings, LLC v. Burwell*,
    156 F. Supp. 3d 798 (W.D. La. 2016) .......................................................................... 25

*Damus v. Nielsen*,
    Civ. A. No. 18-0578 (JEB), 2018 WL 3232515 (D.D.C. July 2, 2018) ...................... 15

*Davis v. Pension Ben. Guar. Corp.*,
    571 F.3d 1288–92 (D.C. Cir. 2009) .............................................................................. 15

*Decatur Liquors v. Dist. of Columbia*,
    478 F.3d 360 (D.C. Cir. 2007) ...................................................................................... 32

*Elec. Privacy Info. Ctr. v. Dep't of Just.*
    15 F. Supp. 3d 32 (D.D.C. 2014) .................................................................................. 34

*Elkins v. Dist. of Columbia*,
    690 F.3d 554 (D.C. Cir. 2012) ...................................................................................... 31

*Emily's List v. FEC*,
    362 F. Supp. 2d 43 (D.D.C. 2005) ................................................................................ 33

*Farris v. Rice*,
    453 F. Supp. 2d 76 (D.D.C. 2006) ................................................................................ 16

*Federal Deposit Insurance Corp. v. Mallen*,
    486 U.S. 230 (1988) ...................................................................................................... 29

*Finca Santa Elena, Inc. v. Army Corps of Eng'rs*,
    873 F. Supp. 2d 363–71 (D.D.C. 2012) ................................................................... 20-21

*Fla. Power & Light Co. v. Lorion*,
    470 U.S. 729 (1985) ...................................................................................................... 20

*Food and Water Watch v. EPA*,
    5 F. Supp. 3d 62–81 (D.D.C. 2013) .............................................................................. 20

*Fox Ins. Co. v. Sebelius*,

381 Fed. Appx. 93 (2d Cir. 2010) ................................................................................. 25

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
    460 F.3d 13 (D.C. Cir. 2006) .................................................................................. 23

*General Electric Co. v. Jackson*,
    610 F.3d 110 (D.C. Cir. 2010) ................................................................................ 30

*Gonzalez Boisson v. Pompeo*,
    459 F. Supp. 3d 7 (D.D.C. 2020) ....................................................................... 31-32

*Greenwald v. Becerra*,
    Civ. A. No. 17-797 (LLA), 2024 WL 3617466 (D.D.C. Aug. 1, 2024) ................................ 18

*Health Care Auth. v. Shalala*,
    988 F.2d 1221 (D.C. Cir. 1993) .............................................................................. 22

*Herbert v. Nat'l Acad. of Scis.*,
    974 F.2d 192 (D.C. Cir. 1992) ................................................................................ 14

*Hospitality Staffing Sols., LLC v. Reyes*,
    736 F. Supp. 2d 192 (D.D.C. 2010) ......................................................................... 15

*Katz v. Georgetown Uni.*,
    246 F.3d 685 (D.C. Cir. 2001) ................................................................................ 39

*King v. Burwell*,
    576 U.S. 473 (2015) ............................................................................................. 3

*Kowal v. MCI Comm. Corp.*,
    16 F.3d 1271 (D.C. Cir. 1994) ................................................................................ 31

*Larsen v. U.S. Navy*,
    525 F.3d 1 (D.C. Cir. 2008) ................................................................................... 17

*League of Women Voters of the U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ................................................................................... 15

*Lemon v. Geren*,
    514 F.3d 1312 (D.C. Cir. 2008) .............................................................................. 17

*Lewis v. Gov't of the D.C.*,
    161 F. Supp. 3d 15–31 (D.D.C. 2015) ...................................................................... 32

*Lovitky v. Trump*,
    918 F.3d 160 (D.C. Cir. 2019) ................................................................................ 21

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ............................................................................................ 14

*Medina v. Dist. of Columbia*,

517 F. Supp. 2d 272 (D.D.C. 2007) ................................................................................ 31

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012) .................................................................................................... 3

*Nat'l Min. Ass'n v. McCarthy*,
    758 F.3d 243 (D.C. Cir. 2014) .................................................................................. 23

*Nat'l Park Hosp. Ass'n*,
    538 U.S. ...................................................................................................................... 19

*Nevada v. Dep't of Energy*,
    457 F.3d 78 (D.C. Cir. 2006) .................................................................................... 19

*Nken v. Holder*,
    556 U.S. 418 (2009) .................................................................................................. 39

*Norton v. S. Utah Wilderness Alliance*,
    542 U.S. 55 (2004) .................................................................................................... 22

*Oregonians for Floodplain Prot.*,
    334 F. Supp. 3d at 73–74 .............................................................................. 19-20, 20

*Papasan v. Allain*,
    478 U.S. 265 (1986) .................................................................................................. 15

*Power Mobility Coal. v. Leavitt*,
    404 F. Supp. 2d 190 (D.D.C. 2005) .......................................................................... 33

*Pursuing Am.'s Greatness v. FEC*,
    831 F.3d 500 (D.C. Cir. 2016) .................................................................................. 15

*Save Jobs USA v. Dep't of Homeland Sec.*,
    105 F. Supp. 3d 108 (D.D.C. 2015) .......................................................................... 33

*Shalala v. Illinois Council*,
    529 U.S. 1–20 (2000) ........................................................................................ 25-26, 26

*Sherley v. Sebelius*,
    644 F.3d 388–93 (D.C. Cir. 2011) ............................................................................ 15

*Small v. Avanti Health Sys, LLC*,
    661 F.3d 1180 (9th Cir. 2011) .................................................................................. 40

*Solomon v. Off. of the Architect of the Capitol*,
    539 F. Supp. 2d 347 (D.D.C. 2008) .......................................................................... 32

*Texas v. United States*,
    86 F. Supp. 3d 591 (S.D. Tex.) ................................................................................. 41

*Theodore Roosevelt Conservation P'ship v. Salazar*,

661 F.3d 66 (D.C. Cir. 2011) ........................................................................................ 17

*Thomas v. Principi*,
394 F.3d 970 (D.C. Cir. 2005) ..................................................................................... 14

*Toms v. Off. of the Architect of the Capitol*,
650 F. Supp. 2d 11–27 (D.D.C. 2009) ......................................................................... 32

*Trudeau v. FTC*,
456 F.3d 178–85 (D.C. Cir. 2006) ......................................................................... 23, 39

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*,
559 F.2d 841 (D.C. Cir. 1977) ..................................................................................... 34

*Weinberger v. Romero-Barcelo*,
456 U.S. 305 (1982) ............................................................................................... 40, 41

*Winter v. Nat. Res. Def. Council*,
555 U.S. 7 (2008) ............................................................................................. 15, 34, 41

## Statutes, Regulations, Rules, and Other Authorities

28 U.S.C. § 1346 ............................................................................................................. 22

28 U.S.C. § 1361 ............................................................................................................. 21

28 U.S.C. § 2201 ............................................................................................................. 21

28 U.S.C. §§ 2201, 1361 ................................................................................................. 21

42 C.F.R. 155.220 ........................................................................................................... 10

42 U.S.C. § 18031 ............................................................................................................. 3

42 U.S.C. § 18032 ............................................................................................................. 5

42 U.S.C. § 18033 ............................................................................................................. 5

42 U.S.C. § 18041 ......................................................................................................... 3, 5

42 U.S.C. § 18083 ............................................................................................................. 5

45 C.F.R § 155.220 ........................................................................................................... 5

45 C.F.R §§ 155.220 ....................................................................................................... 23

45 C.F.R. at § 155.220 .................................................................................................... 24

45 C.F.R. at § 155.221 ................................................................................................. 24-25

45 C.F.R. § 155.20 ............................................................................................... 11, 12, 13

45 C.F.R. § 155.200 ........................................................................................................... 5

45 C.F.R. § 155.220 ....................................................... 5, 6, 2, 5, 7, 10, 11, 13, 23, 26

45 C.F.R. § 155.221 ........................................................................................... 6, 7, 8, 9, 10

45 C.F.R. §§ 155.220 ........................................................................................ 5, 7, 8, 13, 24

77 Fed. Reg. 18310 (Mar. 27, 2012) ................................................................................ 4

77 Fed. Reg. at 18334–36 ................................................................................................ 5

78 Fed. Reg. 54070 (Aug. 30, 2013) ............................................................................... 4

78 Fed. Reg. 65046 .......................................................................................................... 4

78 Fed. Reg. at 54079–80 ............................................................................................. 10

79 Fed. Reg. 30240 (May 27, 2014) ................................................................................ 4

81 Fed. Reg. at 12262, 12339 .......................................................................................... 6

81 Fed. Reg. at 94122 ................................................................................................... 6, 7

82 Fed. Reg. 18346 (Apr. 18, 2017) ................................................................................ 4

83 Fed. Reg. at 16933-34 (Apr. 17, 2018) ...................................................................... 4

83 Fed. Reg. at 16981 ...................................................................................................... 8

84 Fed. Reg. 17454-01, 17515 ........................................................................................ 6

85 Fed. Reg. at 78618–19 ................................................................................................ 7

86 Fed. Reg. at 24208–09 ................................................................................................ 7

5 U.S.C. § 704 ................................................................................................................ 23

5 U.S.C. § 706 ................................................................................................................ 20

5 U.S.C. §§ 551–559, 701–706 ...................................................................................... 22

8 U.S.C. §§ 2201, 1361 ............................................................................................ 16, 39

Fed. R. Civ. P. 12 ..................................................................................................... 14, 22

Defendants—certain agencies and officials of the United States responsible for the operation and oversight of the Federally-Facilitated Exchanges and State-based Exchanges on the Federal Platform ("Exchange" or "Exchanges")[1]—respectfully move to dismiss this action pursuant to Federal Rules of Civil Procedure ("Rules") 12(b)(1) and 12(b)(6) and oppose the amended motion for a temporary restraining order and preliminary injunction and request for expedited hearing ("Pls.' Mot." (ECF No. 9)) filed by Plaintiffs Benefitalign, LLC and TrueCoverage, LLC (collectively "Plaintiffs").

## INTRODUCTION

Plaintiffs bring this action under the Administrative Procedure Act ("APA"), alleging that Defendants' suspension was not in accordance with law or with procedure required by law, and was arbitrary and capricious.  *See generally* Am. Compl. (ECF No. 8) ¶¶ 34–47.  Plaintiffs also claim that the suspension violated the Due Process Clause of the Constitution.  *Id.* ¶¶ 48–55.

Centers for Medicare & Medicaid Services ("CMS") suspended Plaintiffs, each of whom are enhanced direct enrollment entities and private health insurance web-brokers, from accessing the Exchanges' information technology systems, which prevents Plaintiffs from assisting consumers with submitting applications for and enrollments in health insurance plans and insurance affordability programs offered on the Exchanges through their direct enrollment platforms.  CMS also suspended Plaintiffs' ability to make their direct enrollment platforms available to other agents and brokers to assist consumers with submitting applications for and

---

[1]    "Exchange" or "Exchanges" refer to both the Federally-facilitated Exchanges and the State-based Exchanges on the Federal Platform.  In this brief and the annexed exhibits, these "Exchanges" are sometimes referred to as "Federally-facilitated Marketplaces," "State-based Marketplaces on the Federal Platform" "Marketplaces," "FFM," "FFE," "SBM-FP," and "SBE-FP".  The terms are all interchangeable and hereinafter refer to simply as "Exchange or "Exchanges."

enrollments in health insurance plans and insurance affordability programs offered on the Exchanges.

The suspension was implemented because CMS learned that Plaintiffs were engaging in potentially dangerous behavior and received reports of concerning behavior and serious breaches of Plaintiffs' and CMS's agreements. CMS determined Plaintiffs' behavior and the serious breaches compromised and placed consumers' personally identifiable information ("PII") and the integrity of the Exchanges at risk. CMS concluded that it needed to immediately suspend the Plaintiffs' connection to CMS systems Exchanges and their ability to operate as web brokers to prevent any further damage.

During the suspension, however, CMS-registered agents and brokers affiliated with Plaintiffs can continue to assist Exchange consumers with submitting applications and enrolling in Exchange coverage using another approved entity's Classic direct enrollment platform or Enhanced direct enrollment platform, using the Exchanges' Call Center on a three-way call with the enrollees or applicants, or by assisting an enrollee or applicant side-by-side on HealthCare.gov (also referred to as the Exchange Pathway). This will remain the case unless and until the Plaintiffs' Exchange Agreements are suspended or terminated under 45 C.F.R. § 155.220(f)(4) or (g)(4).

Nevertheless, Plaintiffs' motion minimizes the serious risk and their breaches of their contractual obligations and applicable CMS regulations. As mentioned, Plaintiffs' conduct compromised consumers' PII and the integrity of, and confidence in, the Exchanges, and exposed consumers' PII, the Exchanges, and CMS systems to foreign actors, such as users from overseas locations including India and Pakistan and potentially Saudi Arabia and Singapore. This is not the first time CMS had to take enforcement action to address Plaintiffs' non-compliance with CMS's

rules and regulations. Plaintiffs feigned concern that their suspension will harm consumers does not outweigh the harms that Plaintiffs expose consumers and the Exchanges to. The government had to take immediate action and the government, not Plaintiffs, is acting to protect consumers from any further harm.

### STATUTORY AND REGULATORY BACKGROUND

I.    **Web-Brokers, Enhanced Direct Enrollment Entities, Direct Enrollment Entities, and Their Participation in the Exchanges Under the Affordable Care Act.**

In 2010, Congress enacted the Patient Protection and Affordable Care Act (the "Act")[2] with the aim of "increas[ing] the number of Americans covered by health insurance and decreas[ing] the cost of health care." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012). The Act established, among other things, a series of new insurance market reforms in the individual and small group markets and also imposed a number of other requirements for health insurance plans in those markets. *See City of Columbus v. Trump*, 453 F. Supp. 3d 770, 778–79 (D. Md. 2020) (describing the Act's reforms).

To facilitate a market for health insurance products that conform to its market reforms, the Act established "Health Benefit Exchanges" or State-based virtual marketplaces where consumers can purchase qualified health plans. *See* 42 U.S.C. § 18031. The Act "requires the creation of an 'Exchange' in each State—basically, a marketplace that allows people to compare and purchase insurance plans [and] gives each State the opportunity to establish its own Exchange, but provides that the Federal Government will establish the Exchange if the State does not." *King v. Burwell*, 576 U.S. 473, 479 (2015). The Act thus provides for the establishment of Federal-facilitated Exchanges in States that chose not to establish their own Exchanges. 42 U.S.C. § 18041(c)(1).

---

[2]    Pub. L. No. 111-148, 124 Stat. 119 (2010), as amended by the Health Care and Education Reconciliation Act, Pub. L. No. 111-152, 124 Stat. 1029 (2010).

Some States operate a State-based Exchange on the Federal Platform, which is a type of State Exchange that relies on the Department of Health and Human Services ("HHS") services for performing certain Exchange functions, particularly eligibility and enrollment functions, while still retaining responsibility for performing certain other Exchange functions, such as qualified health plan certification and consumer outreach and assistance functions.  *See* State-based Exchanges | CMS, https://www.cms.gov/cciio/resources/fact-sheets-and-faqs/state-marketplaces (last accessed Sept. 20, 2024) .  In addition, HealthCare.gov, the Exchange website administered by HHS, is the Exchange website available to consumers in states with a State-based Exchange on the Federal Platform as well as consumers in states served by a Federal Exchange.  *See* State Health Insurance Marketplace Types, 2024 | KFF, https://www.kff.org/affordable-care-act/state-indicator/state-health-insurance-marketplace-types/?currentTimeframe=0&sortModel=%7B%2 2colId%22:%2 2Location%22,%22sort%22:%22asc%22%7D (last accessed Sept. 20, 2024).  Since the Act's enactment, HHS has engaged in numerous rulemakings to implement various aspects of the law.  *See* 83 Fed. Reg. at 16933-34 (Apr. 17, 2018) (Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2019) (describing prior rulemakings).[3]

The Act directed the Secretary to establish procedures under which a State may permit agents or brokers to enroll individuals and employers in qualified health plans offered through an Exchange in the individual or small group market and to assist individuals in applying for financial

---

[3]    These rulemakings have addressed the frameworks for Exchanges, *see, e.g.* 77 Fed. Reg. 18310 (Mar. 27, 2012) ("Exchange Establishment Rule"); 82 Fed. Reg. 18346 (Apr. 18, 2017) ("Market Stabilization Rule"); health insurance market standards, *see, e.g.*, 79 Fed. Reg. 30240 (May 27, 2014) ("2015 Market Standards Rule"); as well as program integrity standards, *see, e.g.*, 78 Fed. Reg. 54070 (Aug. 30, 2013) ("first Program Integrity Rule"), 78 Fed. Reg. 65046 Oct. 30, 2013) ("second Program Integrity Rule").

assistance for qualified health plans sold through an Exchange.  42 U.S.C. § 18032(e).  The Act also directed the Secretary to establish, subject to certain minimum requirements, a streamlined process for enrollment in qualified health plans and all insurance affordability programs.  *Id.* § 18083(a), (b).  The Act delegates to the Secretary authority to implement any measure or procedure the Secretary determines is appropriate to reduce fraud and abuse.  *Id.* § 18033(a)(5)(A).  The Act also grants the Secretary broad authority to establish standards and issue regulations to implement the statutory requirements related to Exchanges, qualified health plans, and other components of title I of the Act and broadly authorizes the Secretary to implement "other requirements as the Secretary determines appropriate."  42 U.S.C. 18041(a).

Pursuant to the authority granted under the Act, the Secretary adopted 45 C.F.R. § 155.220, establishing standards and requirements applicable to web-brokers[4] assisting individuals, employers, or employees with enrollment in qualified health plans and insurance affordability programs offered through an Exchange.  *See* 77 Fed. Reg. at 18334–36.  For example, web-brokers must take annual training on Exchange coverage options and insurance affordability programs, comply with Exchange privacy and security standards, and complete registration with the Exchange in advance of assisting with enrollments through a Federal Exchange or State-based Exchange on the Federal Platform.  45 C.F.R § 155.220(d), (l).    HHS "or its designee" is

---

[4]    The regulatory definition of a "web-broker" includes an individual agent or broker, group of agents or brokers, or business entity registered with an Exchange under 45 C.F.R. § 155.220(d)(1) that develops and hosts a non-Exchange website that interfaces with an Exchange to assist consumers with direct enrollment in qualified health plans offered through the Exchange as described in 45 C.F.R. §§ 155.220(c)(3) or 155.221. The term also includes an agent or broker direct enrollment technology provider.  *Id.*  Agent or broker direct enrollment technology provider means a type of web-broker business entity that is not a licensed agent or broker under State law and has been engaged or created by, or is owned by an agent or broker, to provide technology services to facilitate participation in direct enrollment under 45 C.F.R. §§ 155.220(c)(3) and 155.221.  *See* 45 C.F.R. § 155.200 (definition of "agent or broker direct enrollment technology provider").

authorized to "periodically monitor and audit" web-brokers.[5] 2017 Payment Notice, 81 Fed. Reg. at 12262, 12339 (adding 45 C.F.R. § 155.220(c)(5)).  Using these same statutory authorities, the Secretary also adopted 45 C.F.R. § 155.221, establishing standards for direct enrollment entities, and enabling third-parties to perform audits of these direct enrollment entities.  *See* 81 Fed. Reg. at 94122.

There are two forms of direct enrollment available in states with a Federal Exchange or State-based Exchange on the Federal Platform: (1) Classic direct enrollment, and (2) Enhanced direct enrollment.  *See* Grant Decl., submitted herewith.  In Classic direct enrollment, consumers start on a direct enrollment entity's website by indicating they are interested in Exchange coverage. S*ee* Direct Enrollment and Enhanced Direct Enrollment | CMS, https://www.cms.gov/marketplace/agents-brokers/direct-enrollment-partners (last accessed Sept. 20, 2024).  The direct enrollment entity's website redirects users to HealthCare.gov to complete the Exchange eligibility application.  *Id*.  After completing their application, HealthCare.gov redirects the consumer back to the direct enrollment entity's website to shop for, and potentially enroll in, a qualified health plan and insurance affordability programs offered through the Exchange.  Enhanced direct enrollment, on the other hand, is a service that allows approved enhanced direct enrollment entities to provide a comprehensive consumer experience.  *See id.*  This experience includes the eligibility application, Exchange enrollment, and post-enrollment year-round customer service capabilities for consumers and agents or brokers working on behalf of consumers.  *Id.*  All of this activity happens directly on issuer and web-broker websites.  Through enhanced direct enrollment, approved direct enrollment entities build and host a version of the

---

[5]   The reference to web-brokers was added to 45 C.F.R. § 155.220(c) in the 2020 Payment Notice.  *See* 84 Fed. Reg. 17454-01, 17515 and 17564 (Apr. 25, 2019).

HealthCare.gov eligibility application directly on their websites. *Id.* These websites are designed to securely integrate with a back-end suite of Exchange application programing interfaces to support application, enrollment, and more. *See id.* This experience includes the eligibility application, Exchange enrollment, and post-enrollment year-round customer service capabilities for consumers and agents or brokers working on behalf of consumers. *Id.* All of this activity happens directly on issuer and web-broker websites. *Id.* Through enhanced direct enrollment, approved direct enrollment entities build and host a version of the HealthCare.gov eligibility application directly on their websites. *Id.* These websites are designed to securely integrate with a back-end suite of Exchange application programing interfaces to support application, enrollment, and more.

Web-brokers who want to assist consumers with direct enrollment in qualified health plans offered through Exchanges must first demonstrate operational readiness to HHS on an annual basis before the web-broker's non-Exchange internet website can be used to assist consumers with eligibility determinations or plan selection. *See* 45 C.F.R. §§ 155.220(c)(6), 155.221(b)(4); *see also* 85 Fed. Reg. at 78618–19. Web-brokers who only participate in Classic direct enrollment are only required to comply with the operational readiness review requirements in 45 C.F.R. § 155.220(c)(6). *See* 85 Fed. Reg. at 78618–19; *see also* 86 Fed. Reg. at 24208–09. A direct enrollment entity must also engage an independent third-party entity to conduct an initial readiness review as well as an annual readiness review. *See* 45 C.F.R. § 155.221(f). This third-party review is intended to demonstrate the direct enrollment entity's operational readiness and compliance with applicable requirements before the entity may use its non-Exchange website to complete an Exchange eligibility application or a qualified health plan selection. *See* 45 C.F.R. §§ 155.220(c)(6), 155.221(f).

These third-party auditors must comply with the Secretary's standards. *See* 83 Fed. Reg. at 16981; 45 C.F.R. § 155.221(g). The third-party auditors are "subject to HHS oversight," 83 Fed. Reg. at 16981; 45 C.F.R. § 155.221(f). The auditors must cooperate with HHS or its designee when HHS conducts an audit, inspection, or other evaluation, and provide access to the third-party entities' records and systems relating to their audits of a direct enrollment entity. *Id.* § 155.221(g)(7). In addition, "the agent, broker, or issuer will remain responsible for compliance with all applicable direct enrollment requirements." 83 Fed. Reg. at 16981. Web-brokers who are direct enrollment entities must enter into Exchange Agreements with CMS as part of demonstrating operational readiness on an annual basis. 45 C.F.R. §§ 155.220(c)(6)(v), 155.221(b)(4)(ii)(A), (v).

## II.    Oversight, Enforcement, and Rebuttal Opportunity

When CMS receives credible information about a direct enrollment entity's potential non-compliance with applicable requirements that requires further investigation, or discovers circumstances that pose unacceptable risk to Exchange operations or Exchange information technology systems, it may immediately suspend a direct enrollment entity or web-broker's access to CMS systems and their ability to transact information with the Exchanges to protect consumers and the integrity of the Exchanges while it conducts an investigation. *See* 45 C.F.R. §§ 155.220(c)(4)(ii), 155.221(e); *see also* Busby Dec., submitted herewith, Ex. I, Interconnection Security Agreement ("Interconnection Agreement"), Section 15. Compliance and Section 16. Termination, at 20, Busby Dec. Ex. F, Enhanced Direct Enrollment Business Agreement ("Enhanced Direct Enrollment Agreement"), Section V. Termination, at 8-10. Under the plain terms of the agreement entered into by the direct enrollment entity, the entity must cooperate with the resulting investigation.

The Interconnection Agreement allows CMS to terminate an entity's access to the Exchanges for non-compliance with the terms of the agreement or unmitigated security risks. This Agreement requires entities to maintain a level of security that is commensurate with the risk and magnitude of the harm that could result from the loss, misuse, disclosure, or modification of the information contained on the system with the highest sensitivity levels. The Interconnection Agreement prohibits an entity from releasing, publishing, or disclosing information to unauthorized personnel.

Non-compliance with the privacy and security standards and operational requirements under the Enhanced Direct Agreement by the Entity, regardless of whether it rises to the level of a material breach of that agreement, may lead to termination of the interconnection between the Parties. CMS may block the entity's access to the Exchanges based on the existence of unmitigated privacy or security risks, or the misuse of the personally identifiable information of consumers. CMS may immediately suspend the entity's ability to access Exchange systems if CMS discovers circumstances that pose unacceptable or unmitigated risk to the Exchanges. If the CMS imposes a suspension, CMS will provide written notice within two business days of imposing a suspension.

CMS may immediately suspend a direct enrollment entity's connection to CMS Exchange information technology systems "if HHS discovers circumstances that pose unacceptable risk to the accuracy of the Exchange's eligibility determinations, Exchange operations, or Exchange information technology systems." 45 C.F.R. § 155.221(e). The Secretary will notify the direct enrollment entity of the suspension and provide an opportunity to submit rebuttal evidence and information, or otherwise demonstrate that the circumstances of the incident or breach are sufficiently remedied or mitigated to HHS's satisfaction before the suspension may be lifted. *Id.* CMS, on behalf of HHS, reviews the evidence and information submitted by the direct enrollment

entity to determine if the circumstances of the incident or breach are sufficiently remedied or mitigated to warrant reinstating their system access. *Id.* CMS also has authority to immediately suspend a web-broker's ability to make its non-Exchange website available to other agents and brokers who assist consumers with Exchange applications and enrollments if HHS discovers a security and privacy incident or breach. 45 C.F.R. § 155.220(c)(4)(ii). In such a case HHS must follow its incident response plan to address privacy and security incidents and breaches. 78 Fed. Reg. at 54079–80. Under the incident response plan, HHS may need to temporarily suspend a web-broker's connection to CMS systems and the web-broker's ability to make its non-Exchange website available to other agents and brokers to prevent further damage from the incident or breach. *Id.* The temporary suspension is intended to allow HHS to conduct an investigation and otherwise work with the web-broker to remedy the breach or incident to HHS's satisfaction. *Id.*

In situations where the suspended entity does not provide rebuttal evidence and information, or the evidence and information submitted does not sufficiently remedy or mitigate the circumstances of the incident or breach to HHS' satisfaction, CMS will not lift the suspension to reinstate the entity's system access. 42 C.F.R. 155.220(c)(4)(ii). In that case—where rebuttal evidence or information is not submitted, or where it is insufficient to mitigate the potential security breach—CMS will pursue a suspension or termination of the entity's Exchange Agreements. *See, e.g.*, 45 C.F.R. § 155.220(g). An enforcement action under § 155.220(g) to suspend or terminate a web-broker's Exchange Agreements results in the web-broker no longer being registered with the Exchanges. 45 C.F.R. § 155.220(g)(4) and (5)(iii). When CMS suspends or terminates a web-broker's Exchange Agreements, the web-broker can no longer assist with or facilitate enrollment of individual consumers or employers and their employees in coverage through a Federal Exchange or State-based Exchange on the Federal Platform or assist individuals

in applying for financial assistance for Exchange coverage. *Id.* These web-brokers cannot submit Exchange applications and enrollments through any of the available pathways—i.e., through Classic direct enrollment, Enhanced direct enrollment, the Exchange Call Center, and/or through HealthCare.gov. A web-broker whose Exchange Agreements are terminated can request reconsideration of such action. *See* 45 C.F.R. § 155.220(h)(1). HHS is required to provide written notice of its reconsideration decision within 60 calendar days of receipt of the reconsideration request. 45 C.F.R. § 155.220(h)(3). The agency's decision on reconsideration then becomes the agency's final decision. *Id.*

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff BenefitAlign is an enhanced direct enrollment entity and Plaintiff TrueCoverage, is a private health insurance agency and, is a private health insurance web-broker. Am. Compl. (ECF No. 8) ¶¶ 6–7; *see* 45 C.F.R. § 155.20 (definition "web-broker"); *see* Grant Decl. In order to participate in the Exchange as approved web-brokers and Enhanced direct enrollment partners in the Exchange, both Plaintiffs entered into Enhanced Direct Agreements and Web-Broker Agreements with CMS. *See* Busby Dec. Exs. E, F, G, and H. Plaintiffs enter into the Enhanced Direct Enrollment and Web-Broker Agreements with CMS annually. In addition, Plaintiff Benefitalign also participates as direct enrollment partner in the Exchange and entered into an Interconnection Agreement with CMS. Busby Dec. Ex. I.

On July 23, 2024, CMS's Information Technology Service Desk received an email from an agent/broker, stating that a company had fraudulently used his credentials that led to the suspension of his access to the Exchange systems. Busby Decl. Ex. B. Also, attached to the email was a complaint filed in the U.S. District Court for the Southern District of Florida against Plaintiff TrueCoverage, LLC and the parent corporation of both Plaintiffs in this lawsuit, Speridian Technologies, LLC. Ex. A; *see also Turner v. Enhance Health, LLC*, Civ. A. No. 24-60591 (S.D.

Fla. Apr. 12, 2024), ECF No. 1.    In addition, attached to the email were declarations raising concerning allegations against both Plaintiffs and their parent company Speridian.

On July 29, 2024, CMS's Security Operations Center received a report that the Speridian Companies' Customer Relationship Management system may be based overseas, which would violate its Agreements with CMS.  CMS became concerned that the privacy and security of Exchange data, including consumer PII, was processed or stored outside of the United States, which is a violation of the Exchange agreements. Accordingly, CMS performed a supply chain risk assessment and on August 6, 2024, "[t]he assessment concluded that the overall risk to CMS data and information systems was critical, meaning that the product, service or supplier contains vulnerabilities or weaknesses that are wholly exposed and easily exploitable."    *See* Busby Decl. The next day, CMS initiated a "privacy risk assessment…to assess whether there was a high likelihood that the Speridian Companies were transmitting or storing [Exchange] data outside their approved environment and/or outside of the United States." *Id.* ¶ 7.

On August 8, 2024, CMS concluded that there was sufficient evidence that the Speridian Companies' platforms could be accessed by systems that were not authorized by the agreements between CMS and the Speridian Companies,' both inside and outside of the United States and immediately suspended Plaintiffs' access to the Exchange.  *Id*. ¶ 11. The suspension "is a temporary situation" to allow "CMS [to] continue[] its review of apparent breaches…[and] to protect the public until CMS can [complete its assessment]." *See id.* ¶ 12.

On August 13, 2024, CMS met with Plaintiffs again and "discussed reports of improper access to CMS systems from outside of the United States, in addition to reports that [Exchange] data were being transmitted and stored in non-CMS approved systems in foreign countries." *Id.* ¶ 13.  Plaintiffs disputed CMS's assessment.  *Id.*  CMS requested that Plaintiffs produce information.

After reviewing the information Plaintiffs provided, CMS had concerns that "three [internet protocol] addresses belong to companies known for providing [virtual private network] services, [that could be] used…to mask locations or encrypt internet traffic…[that] might [be used to] bypass geoblocking and reach destinations outside the [United States]." *Id.*

On August 15, 2024, CMS met again with Plaintiffs and requested additional information including "system logs . . . to verify the reported location of the internet protocol (IP) addresses connecting to [Plaintiffs'] information systems and the data accessed in those information systems." *Id.* ¶ 17. CMS sought information about measures Plaintiffs "have put in place to prevent overseas users from using [virtual private networks] to connect to the information systems that contained CMS data and transmit the data to other locations." *Id.*

CMS continued reviewing information that Plaintiffs produced, and new concerns developed. For example, "data analysis revealed multiple other anomalies, including access to the [Plaintiffs'] [electronic data exchange] platforms by at least eleven unique users from overseas locations, including in India and Pakistan." *Id.* ¶ 17.

On August 29, 2024, Plaintiffs filed this action bringing claims under the APA and alleging a violation of the Due Process Clause. *See generally* Compl. (ECF No. 1).

On September 2, 2024, CMS sent its suspension and audit notice, pursuant to 45 C.F.R. §§ 155.220(c)(4)(ii) and 155.221(e), and attributable to credible allegations of misconduct, CMS had suspended Plaintiffs' ability to transact with the Exchanges and their ability to make their platforms available to other agents and brokers to transact with the Exchanges. *See id.* ¶ 24. In addition, pursuant to 45 C.F.R. § 155.220(c)(5), the Enhanced Direct Agreement, the Web-Broker Agreement, and the Interconnection Agreement, CMS notified Plaintiffs of its intent to conduct a compliance review and audit. *Id.* Subsequently thereafter, Plaintiffs amended their complaint and

- 13 -

their motion for a temporary restraining order, preliminary injunction, and hearing, *see generally* ECF Nos. 8 and 9.

Defendants now move to dismiss Plaintiffs' amended complaint pursuant to Rule 12(b)(1) and 12(b)(6) and opposes Plaintiffs' motion.

## LEGAL STANDARDS

### I.     Rule 12(b)(1)

Under Rule 12(b)(1), a plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). A court considering a Rule 12(b)(1) motion must "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged.'" *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)). A court may examine materials outside the pleadings as it deems appropriate to resolve the question of its jurisdiction. *See Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).

### II.     Rule 12(b)(6)

Under Rule 12(b)(6), the Court may dismiss a Complaint where a plaintiff fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When resolving a motion to dismiss pursuant to Rule 12(b)(6), the pleadings are construed broadly so that all facts pleaded therein are accepted as true, and all inferences are viewed in a light most favorable to the plaintiff. *See Iqbal*, 556 U.S. at 678. However, a court is not required to accept conclusory allegations or unwarranted factual

deductions as true. *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Likewise, a court need not "accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Ultimately, the focus is on the language in the complaint and whether that sets forth sufficient factual allegations to support a plaintiff's claims for relief.

III.    <u>**Preliminary Injunction**</u>

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). A party seeking preliminary relief must make a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (quoting *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016)). The moving party bears the burden of persuasion and must demonstrate, "by a clear showing," that the requested relief is warranted. *Hospitality Staffing Sols., LLC v. Reyes*, 736 F. Supp. 2d 192, 197 (D.D.C. 2010) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)).

Before the Supreme Court's decision in *Winter*, courts weighed these factors on a "sliding scale," allowing "an unusually strong showing on one of the factors" to overcome a weaker showing on another. *Damus v. Nielsen*, Civ. A. No. 18-0578 (JEB), 2018 WL 3232515, at *4 (D.D.C. July 2, 2018) (quoting *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009)). This Circuit has hinted, though not held, that *Winter*—which overturned the Ninth Circuit's "possibility of irreparable harm" standard—establishes that "likelihood of irreparable harm" and "likelihood of success" are "independent, free-standing requirement[s]." *Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011); *see also League of Women Voters*, 838 F.3d at

- 15 -

7 (declining to address whether "sliding scale" approach is valid after *Winter*).  And where, as here, a party "seeks a mandatory injunction—to change the status quo through action rather than merely to preserve the status quo—typically the moving party must meet a higher standard than in the ordinary case: the movant must show 'clearly' that [it] is entitled to relief or that extreme or very serious damage will result."  *Farris v. Rice*, 453 F. Supp. 2d 76, 78 (D.D.C. 2006).

<strong>ARGUMENT</strong>

The Court should dismiss Plaintiffs' Amended Complaint because it lacks jurisdiction over Plaintiffs' claims and Plaintiffs fail to state a claim upon which relief may be granted.  Should this Court however find that jurisdiction resides within this Court and Plaintiffs have stated a claim upon which relief can be granted, Plaintiffs' request for temporary restraining order, preliminary injunction motion, and request for a hearing should be denied.  Plaintiffs simply have not established that they are entitled to this extraordinary remedy.  For the reasons discussed further below, the Court should dismiss this matter in its entirety and deny Plaintiffs' Motion.

**I.      This Action Should Be Dismissed for Lack of Jurisdiction.**

The Court should find that its lacks jurisdiction over Plaintiffs' claims because any challenges relating to the August 8, 2024, Suspension Email ("August 8 Email") are moot, any challenges relating to the suspension are not ripe, and there are no allegations to establish subject matter jurisdiction under 8 U.S.C. §§ 2201, 1361, and 1346.

**A.      Any Claims Related to the August 8 Email Are Moot.**

To the extent Plaintiffs claim that the August 8 Email was not in accordance with law or with procedure required by law and was arbitrary and capricious and violated the Due Process Clause, these claims are moot.

Federal courts lack subject matter jurisdiction to decide moot questions.  *Burke v. Barnes*, 479 U.S. 361, 363 (1987) ("Article III of the Constitution requires that there be a live case or

controversy at the time that a federal court decides the case"). A case or claim becomes moot "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Larsen v. U.S. Navy*, 525 F.3d 1, 3-4 (D.C. Cir. 2008) (quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)). Thus, mootness deprives the court of jurisdiction and requires dismissal "when intervening events make it impossible to grant the prevailing party effective relief." *Lemon v. Geren*, 514 F.3d 1312, 1315 (D.C. Cir. 2008). "If it becomes impossible for the court to grant any effectual relief *whatever* to a prevailing party on a particular claim, that claim must be dismissed," *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 79 (D.C. Cir. 2011) (emphasis added and internal quotations omitted), "[n]o matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013).

Here, the August 8 Email, and any purported deficiencies, has been superseded by the September 2, 2024 "Suspensions of Web-broker and Enhanced Direct Enrollment Entity Activities and Notice of Compliance Audit" notice (the "September 2 Notice"), which provides a detailed explanation and additional grounds for suspending Plaintiffs' access to the Exchanges' information technology systems and their ability to make their direct enrollment platforms available to other agents and brokers to transact information with the Exchanges. *See* Busby Dec. ¶ 24. The September 2 Notice not only incorporates the August 8 Email but also supplements the basis for the suspension with additional information gathered between August 8 and September 2 and leverages additional regulatory authority for suspending Plaintiffs' Exchange system access. *Compare id. with* Busby Dec. ¶ 11. Indeed, courts in this district regularly find that actions challenging superseded agency polices or decision documents are moot because they no longer present a live controversy. *See, e.g.*, *Theodore Roosevelt Conservation P'ship*, 661 F.3d at 79

- 17 -

(finding that a superseded agency policy document "no longer exists" and any action brought to challenge it is moot); *Greenwald v. Becerra*, Civ. A. No. 17-797 (LLA), 2024 WL 3617466, at *7 (D.D.C. Aug. 1, 2024) (Medicare contractor issuing new local coverage determination rendered the lawsuit challenging the original local coverage determination moot); *Blue Water Balt. v. Pruitt*, 266 F. Supp. 3d 174, 180–81 (D.D.C. 2017) (determining that where a newly issued EPA report superseded the previous iteration of the report, it "thus moot[ed] the plaintiffs' challenge to the reclassifications in the [original report]").

Thus, the September 2 Notice renders any challenges or claims Plaintiffs may have relating to the August 8 Email moot and the Court should dismiss any such claims for lack of jurisdiction.

## B.    Plaintiffs' Claims Are Not Ripe.

This Court lacks subject matter jurisdiction over Plaintiffs' claims because Plaintiffs' claims are not ripe.  The ripeness doctrine requires that a litigant's claims be "constitutionally and prudentially ripe," so as to protect: (1) "the agency's interest in crystallizing its policy before that policy is subjected to judicial review," (2) "the court's interests in avoiding unnecessary adjudication and in deciding issues in a concrete setting," and (3) "the petitioner's interest in prompt consideration of allegedly unlawful agency action." *Asante v. Azar*, 436 F. Supp. 3d 215, 224 (D.D.C. 2020) (quoting *Nevada v. Dep't of Energy*, 457 F.3d 78, 83–84 (D.C. Cir. 2006). "Ripeness is a justiciability doctrine designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Nat'l Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807–08 (2003) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967)).  Here, Plaintiffs fail to demonstrate that their claims are prudentially ripe.

Here, Plaintiffs can not demonstrate that their claims are prudentially ripe.  In order to satisfy the prudential elements of ripeness courts consider "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hosp. Ass'n*, 538 U.S. at 808.  In actions against agencies, the inquiry focuses on: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *Nevada v. Dep't of Energy*, 457 F.3d 78, 84 (D.C. Cir. 2006) (quoting *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998)).

Here, Plaintiffs attempt to challenge the suspension, *see generally* Am. Compl. (ECF No. 8), however, as elaborated further below, Plaintiffs do not challenge any final agency action.  The suspension and the September 2 Notice is merely the first stage of a process, which is underway.  As the September 2 Notice advised Plaintiffs, there is a need for the Defendants to conduct an audit because of reports and information showing potential, credible, and serious lapses and security breaches by Plaintiffs.  *See* Busby Dec. ¶ 24; *see also* Wu Decl. Ex. A.  Defendants have issued no formal findings at this time and the September 2 Notice is not the consummation of Defendants' fact finding.  During the audit, Plaintiffs will be able to produce evidence, explain any discrepancies found during such review, and challenge any findings from the audit, and reopening Plaintiffs' access to the Exchanges and permitting other agents and brokers to use Plaintiffs' direct enrollment platforms to transact information with the Exchanges at this time would circumvent the administrative process.  The outcome of process is unknown at this time, and judicial intervention would impede this administrative process and inappropriately interfere with further administrative action. Therefore, dismissal is warranted. *See Oregonians for*

*Floodplain Prot.*, 334 F. Supp. 3d at 73–74 (dismissing on ripeness grounds in part to not interfere with the administrative process); *Food and Water Watch v. EPA*, 5 F. Supp. 3d 62, 80–81 (D.D.C. 2013) (same).  And any "theoretical possibility of future hardship arising from the Court's decision to withhold review until the agency's position is settled does not overcome the finding that the case is not yet 'fit' for judicial resolution."  *Belmont Abbey Coll. v. Sebelius*, 878 F. Supp. 2d 25, 41 (D.D.C. 2012).

Also, "[t]his Circuit has previously held that courts should refrain from 'intervening into matters that may best be reviewed at another time or in another setting, even if the issue presented is purely legal and otherwise fit for review."  *Id.* at 41. (internal quotations and citations omitted).  The Court would benefit from further factual development of the issues presented in this case.  If Plaintiffs eventually challenge Defendants' final agency action under the APA, the Court will have the benefit of an administrative record, compiled by the agency, reflecting what the agency considered in making its decision and the agency's explanation for its final agency action.  *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("[T]he task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court."); *see also* 5 U.S.C. § 706 ([T]he court shall review the whole record….").  This factor also militates against review at this time.  *See Oregonians for Floodplain Prot.*, 334 F. Supp. 3d at 73–74 (dismissing on ripeness grounds in part to allow for further factual development); *Food and Water Watch*, 5 F. Supp. 3d at 80–81 (same).

"Because of the prudential considerations which innervate the ripeness doctrine," courts will dismiss claims "'even if there is not a constitutional bar to the exercise of [ ] jurisdiction'" *Full Value Advisors*, 633 F. 3d at 1106 (internal quotation marks and citation omitted), and thus

dismissal is warranted in this matter.  *See, e.g.*, *Finca Santa Elena, Inc. v. Army Corps of Eng'rs*, 873 F. Supp. 2d 363, 370–71 (D.D.C. 2012) (granting motion to dismiss based on lack of prudential ripeness).

### C.  Plaintiffs' Other Assertions of Jurisdiction Also Fail.

Plaintiffs assert jurisdiction under a host of other statutes, including 28 U.S.C. §§ 2201, 1361, and 1346; however, Plaintiffs have failed to meet their burden and establish that the Court has jurisdiction under any of these statues.

First, Plaintiffs assert jurisdiction under the Declaratory Judgment Act (28 U.S.C. § 2201). *See* Am. Compl. ¶ 13.  But that statute does not provide this Court with an independent source of federal subject matter jurisdiction.  *California v. Texas*, 593 U.S. 659, 672 (2021) ("The Declaratory Judgment Act, 28 U.S.C. § 2201, alone does not provide a court with jurisdiction."); *Lovitky v. Trump*, 918 F.3d 160, 161 (D.C. Cir. 2019) ("But § 2201 (declaratory judgment) is not an independent source of federal jurisdiction." (citations and internal quotations omitted)); *see also C&E Servs., Inc. v. D.C. Water & Sewer Auth.*, 310 F.3d 197, 201 (D.C. Cir. 2002) ("[W]e begin with the well-established rule that the Declaratory Judgment Act is not an independent source of federal jurisdiction." (internal quotation omitted)).   Accordingly, Plaintiffs are not entitled to any relief under 28 U.S.C. § 2201.

Plaintiffs also assert mandamus jurisdiction.  Am. Compl. (ECF No. 8) ¶ 13 (citing 28 U.S.C. § 1361).  Similar to their declaratory judgment claim, Plaintiffs cannot establish jurisdiction under this statute.  Separate from the failure to establish jurisdiction, the remedy of mandamus is "one of 'the most potent weapons in the judicial arsenal.'" *Cheney v. U.S. Dist. Ct. for Dist. Of Columbia*, 542 U.S. 367, 380 (2004). Due to the potential conflict between the branches of government engendered by use of this remedy, courts have limited its application to "only . . . the clearest and most compelling cases." *13th Reg'l Corp., v. Dep't of Interior*, 654 F.2d 758, 760

- 21 -

(D.C. Cir. 1980).  The Amended Complaint is devoid of any facts that meet the requirements for mandamus relief. Mandamus requires a clear and certain claim, a non-discretionary duty of the Defendants, and the absence of any other remedy.  *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64, 66 (2004) (mandamus only available to compel acts that are ministerial and nondiscretionary).  Plaintiffs have not – nor can they - attempted to demonstrate how or why they are entitled to this extraordinary relief, which warrants dismissal under both Rule 12(b)(1) and 12(b)(6).

Finally, Plaintiffs assert jurisdiction under 28 U.S.C. § 1346.  Am. Compl. (ECF No. 8 ¶ 13).  This basis is inapposite, however, as it applies to taxes and monetary damages against the United States, which are not at issue here and thus the Court lacks jurisdiction under this statute.

## II.    This Action Should Also Be Dismissed for Failure to State a Claim.

The Court should dismiss Plaintiffs' claims because Plaintiffs have not identified any final agency action, which is necessary to sustain a claim under the APA and Plaintiffs' statutory and constitutional claims fail as a matter of law.

### A.  Plaintiffs Do Not Have a Viable APA Claim.

In a suit seeking judicial review of agency action under the standards of the APA, 5 U.S.C. §§ 551–559, 701–706, the "entire case on review is a question of law, and only a question of law." *Marshall Cnty.  Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993).  And an APA suit can be resolved on a motion to dismiss, without examination of the administrative record, where the dispute involves competing interpretations of statutes and regulations.  *See Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 271 F.3d 262, 266–67 (D.C. Cir. 2001) (noting that a claim that agency action is contrary to statute can be resolved without examining an administrative record).  Plaintiffs' APA claim is ripe for dismissal for three reasons: (1) there is no final agency

- 22 -

action; (2) the suspension was authorized under Defendants' regulations; and (3) the suspension is authorized under the agreements between the parties.

### 1.    There is No Final Agency Action.

Plaintiffs' claims have been brought under the APA, *see* Am. Compl. (ECF No. 8) ¶¶ 34–47, which limits review to "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704 (emphasis added).   Finality is a "threshold question" that determines whether judicial review is available under the APA. *See Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 18 (D.C. Cir. 2006).   "An agency action is final only if it is *both* 'the consummation of the agency's decisionmaking process' and a decision by which 'rights or obligations have been determined' or from which 'legal consequences will flow.'" *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 250 (D.C. Cir. 2014) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)) (emphasis in original).

Here, Plaintiffs have not identified any final agency action, which is necessary to sustain any claims under the APA and if the challenged agency action is not "final," the claims must be dismissed.[6]   In addition to the reasons discussed above (*supra* at 18–20), the September 2 Notice can hardly be considered "final agency action."   Under CMS's regulations and the agreements entered into by Plaintiffs and the agency, the suspension is a temporary measure that can be invoked by the agency when it discovers circumstances that pose unacceptable risk to consumers and the Exchanges.   *See* 45 C.F.R §§ 155.220(c)(4)(ii) and 155.221(e).   As detailed in the September 2 Notice, the agency has determined that there is a need for the Defendants to conduct an audit to further investigate the matter and confirm the Plaintiffs' compliance with applicable

---

[6]    In *Trudeau v. FTC*, 456 F.3d 178, 184–85 (D.C. Cir. 2006), the D.C. Circuit made clear that, even though the APA's final agency action requirement was not jurisdictional, it was a necessary requirement in order for the plaintiff to state a cause of action under the APA.

requirements in CMS regulations, and the terms and conditions of their Exchange Agreements. *See* 45 C.F.R. § 155.220(c)(5); *see also* Enhanced Direct Enrollment Agreement, section X.m. at; Web-Broker Agreement, section X.l; Executed Interconnection Agreement, Section 15.  The audit process is an interactive process that will include, and has already included, a series of back-and-forth communications between Plaintiffs and CMS, requests for data and information from CMS, the transmission of data and information from Plaintiffs to CMS, and an opportunity for Plaintiffs to challenge the findings of the audit, and it will conclude with a final decision issued by CMS. At any point during this audit, CMS could lift the suspension if it is determined that the privacy and security concerns that led to the audit have been sufficiently remedied or mitigated.  The September 2 Notice thus signals the beginning of the agency auditing work; it does not "mark the consummation of the agency's decisionmaking process."  *See Bennett*, 520 U.S. at 177–178.

Thus, Plaintiffs have failed to identify any action, including the September 2 Notice, that constitutes a final agency action under *Bennett v. Spear*, 520 U.S. at 177–78, and the Complaint therefore fails to state a claim on this ground alone.

### 2.    Temporary Suspension Is Permitted Under CMS's Regulations

CMS's September 2 Notice also makes plain that the agency's suspension is authorized under its regulations.  *See* 45 C.F.R. §§ 155.220(c)(4)(ii), 155.221(e).  Those authorities specifically advise companies like Plaintiffs that "HHS retains the right to temporarily suspend the ability of a web-broker making its website available to transact information with HHS, if HHS discovers a security and privacy incident or breach, for the period in which HHS begins to conduct an investigation and until the incident or breach is remedied to HHS' satisfaction."  *Id.* at § 155.220(c)(4)(ii).  Similarly, the regulations grant very broad discretion for the Secretary to "immediately suspend the direct enrollment entity's ability to transact information with the Exchange if HHS discovers circumstances that pose unacceptable risk to the accuracy of the

Exchange's eligibility determinations, Exchange operations, or Exchange information technology systems until the incident or breach is remedied or sufficiently mitigated to HHS' satisfaction." *Id.* at § 155.221(e).    As explained above and in the attached Busby Declaration, CMS received credible reports about Plaintiffs' security lapses that placed the Exchanges and consumers at great risk.  CMS immediately began its own assessment to determine the extent of the risk and confirm the reports of lapses in data security.  Even after the agency initiated the suspension on August 8, 2024, CMS continued to work with Plaintiffs, providing them the opportunity to address the information CMS had received.

In a variety of contexts, Courts defer to an agency when it needs to take emergency action that requires immediate response.  In the Medicare context, for example, courts have required an administrative process to conclude before it will intervene, even when the potential harm to a Plaintiff is great.  In *D&G Holdings, LLC v. Burwell*, 156 F. Supp. 3d 798 (W.D. La. 2016), a laboratory sued the Secretary for withholding Medicare payments pursuant to a Medicare overpayment dispute.  *See id.* at 803.  The district court dismissed the plaintiff's substantive due process claim even though the Plaintiff had described a "dire situation, one where a government contract erroneously claims overpayment in an unreasonable amount, binds the provider in a seemingly endless administrative process, withholds 95% of the provider's income, and forces the provider out of business before it can receive its day in court." *Id.* at 809, 817.

Similarly, in *Fox Ins. Co. v. Sebelius*, 381 Fed. Appx. 93 (2d Cir. 2010), CMS terminated its contract with a Medicare Part D plan because CMS determined the plan failed to provide drug benefits "in accordance with CMS requirements…and professionally recognized standards of care," putting enrollees at risk of serious harm.  *Id.*  The Plaintiff claimed that CMS's termination put the company at risk of severe financial hardship and at the brink of bankruptcy.  *Id.* at 96.  The

Second Circuit held that Plaintiff's threat of financial harm did not fall under any narrow exception contemplated by *Shalala v. Illinois Council*, 529 U.S. 1, 19–20 (2000) (the Medicare exhaustion requirement), and that the Plaintiff first had to pursue administrative remedies before seeking judicial review. *Id.* at 97. Although the case before this Court does not involve the Medicare program, exhaustion principles still apply—Plaintiffs will have opportunities to challenge audit findings and any ultimate final agency action that may result after conclusion of the audit. *See* 45 C.F.R. § 155.220(g)(5)(i)(B) and (h). Plaintiffs also have the opportunity to resolve, remediate, or otherwise mitigate the privacy and security concerns at various stages of the process, but there is no reason for judicial intervention before the agency issues a final decision.

Because the regulations here authorize CMS to impose a suspension to protect the privacy and security of Exchange consumers' PII or data and CMS information technology systems, this Court, like the other courts, must wait until the agency's administrative process concludes and there is a final agency decision before reviewing the agency action. For these reasons, this Court should dismiss Plaintiffs' action.

### 3. Temporary Suspension Is Permitted Under the Plain Terms of the Agreements with Plaintiffs.

CMS received complaints and reports about Plaintiffs' compliance with CMS Exchange requirements, including concerns related to the privacy and security of Exchange consumer data, including but not limited to consumer PII, and CMS information technology systems. As a result, on August 8, 2024, CMS preliminarily suspended Plaintiffs' access to the Exchanges while CMS continued its review of the alarming reports it received and further engaged with Plaintiffs. On September 2, 2024, CMS sent a letter to Plaintiffs explaining that the agency had suspended Plaintiffs' access to the CMS Exchanges pursuant to the agency's obligations under the parties'

- 26 -

Exchange Agreements and in accordance with its regulatory authority.[7]  This action is reasonable and complies with the terms of the parties' agreements.

Specifically, Section X.m of the Enhanced Direct Enrollment Agreement, Section X.1 of the Web-Broker Agreement, and Section 15 of the Interconnection Agreement authorizes CMS's action here. For example, Section 15 of the Interconnection Agreement provides:

> *Non-compliance with the terms of this ISA by either party or unmitigated security risks in violation of this ISA may lead to termination of the interconnection. CMS may block network access for the Non-CMS Organization if the Non-CMS Organization does not implement reasonable precautions to prevent the risk of security incidents spreading to CMS's network.* CMS is authorized to audit the security of Non-CMS Organization's Network periodically by requesting that Non-CMS Organization provide documentation of compliance with the security requirements in this ISA (please refer to Section 22, Records). The Non-CMS Organization shall provide CMS reasonable access to its IT resources impacted by this ISA for the purposes of audits, subject to applicable legal requirements and policies.

The Enhanced Direct Enrollment Agreement likewise grants CMS extensive authority to conduct thorough audits and provides, in pertinent part, that the agency has "the right to audit [Plaintiffs'] compliance with and implementation of the privacy and security requirements under this Agreement [and other agreements with CMS] and applicable program requirements."  The Web-Broker Agreement provides for essentially the same audit authority as the Enhanced Direct Enrollment agreement.

Plaintiffs ignore the fact that their agreements with CMS permit the precise action that the agency has undertaken here, and in particular the authorization pursuant to the Interconnection Agreement for the August 8 immediate suspension.  CMS received credible reports of serious

---

[7]    As explained in the September 2 Notice, "…CMS has determined that continuing the August 8, 2024, suspension of the Speridian Companies is necessary and appropriate."  The immediate suspension initiated on August 8 was pursued under Section 15 of the Interconnection Agreement.

privacy and security lapses that placed the Exchanges and consumers at risk, and CMS's initial review as well as its discussions with Plaintiffs did not resolve CMS's concerns or sufficiently remediate or mitigate the identified risks. For example, CMS received information from an agent/broker stating that a company had fraudulently used his credentials that resulted in his suspension from accessing the Exchanges. *See* Busby Decl. CMS also learned of a lawsuit filed against Plaintiff TrueCoverage, whichincluded signed declarations. *See Turner*, Civ. A. No. 24-60591, ECF No. 1. Then on July 29, 2024, CMS received a report that the Plaintiffs' Customer Relationship Management system may be based overseas in violation of its Agreements with CMS. *See* Busby Dec.

On August 6, 2024, CMS received the results of an assessment that concluded "that the overall risk to CMS data and information systems was critical, meaning that the product, service or supplier contains vulnerabilities or weaknesses that are wholly exposed and easily exploitable." *See id*. "On August 8, 2024, CMS concluded that there was sufficient evidence that [Plaintiffs'] platforms could be accessed by systems that were not included within the agreements between CMS and [Plaintiffs] both inside and outside of the United States to warrant immediately suspending their ability to transact information with the [Exchanges]." *See id*. This violated Section X.n of the Enhanced Direct Enrollment Agreement, which prohibits an entity to "remotely connect or transmit data to the [Exchange or] remotely connect or transmit data to [Plaintiffs'] systems that maintain connections to the [Exchange] or its testing environments, from locations outside of the United States of America. [including] any such connection through virtual private networks (VPNs)." *Id*. CMS continued to review this matter over the next several weeks, but the review led to more concerns. *Id*. ¶¶ 14–23.

CMS clearly has authority under its agreements with Plaintiffs to suspend their access to the Exchanges.  As set forth above, and in the attached Declarations, CMS's decision to continue the suspension pending an audit is reasonable under the circumstances.  Furthermore, Plaintiffs voluntarily entered into these agreements and agreed to comply with CMS requirements and allow CMS to suspend their access to the Exchanges, as well as to conduct the ensuing audit.

In addition to the Plaintiffs' voluntarily agreeing to comply with the requirements to participate in the Exchanges, the agency has its own obligations and duty to ensure the privacy and security of Exchange data and CMS information technology systems.  In emergency situations, such those presented here, where Plaintiffs' access to consumers' private information and the Exchanges can result in great harm to the public and CMS information technology systems, it is prudent that CMS has the authority to suspend Plaintiffs' access to the Exchanges – particularly when it receives credible information, confirmed by initial review, that entities like Plaintiffs engaged in improper behavior.  In *Federal Deposit Insurance Corp. v. Mallen*, 486 U.S. 230, 244 (1988), the Supreme Court held that an agency may issue a suspension and hold a post-suspension hearing if the public interests weigh in the agency's favor.  In that case, a bank president was suspended from his role after being indicted.  *Id.* at 237–38.  The court did not require that the agency wait for the conclusion of the court proceedings.  The Plaintiff there likewise moved for a preliminary injunction before an administrative hearing could be held.  *Id.* at 239.  Although the Plaintiff had an interest in the right to continue in his role as bank president, the Court found a post-suspension procedure was not unconstitutional because of the government's recognized interest in maintaining confidence in the banks, and due process did not require providing Plaintiff a pre-suspension hearing.  *See id.* at 245, 248.

Here, the protection of consumers' PII and confidence in, along with the protection of the security of CMS information technology systems, is likewise a substantial, legitimate government interest. And in the same manner, the need to implement a suspension to provide protection while CMS conducts an audit is reasonable, even if it is disruptive to Plaintiffs' current lines of business.

Similarly, in *General Electric Co. v. Jackson*, 610 F.3d 110 (D.C. Cir. 2010), the D.C. Circuit upheld a unilateral administrative order process issued by the EPA. The Court acknowledged the Plaintiff company faced financial consequences and recognized that other administrative enforcement schemes addressing similar matters may offer more process than the one at issue. *Id.* at 129. But the court nevertheless held that the process offered by the EPA did not deprive Plaintiff of due process. *Id*.

In this case, Plaintiffs have access to highly private consumer information and CMS information technology systems—and knowingly agreed that CMS has the authority to issue Exchange system suspensions when necessary to protect the public and CMS information technology systems from irreparable harm due to Plaintiffs' behavior. This framework adopted by CMS in its agreements do not violate due process nor support a claim under the APA. Thus, this matter should be dismissed.

### B. Plaintiff's Fifth Amendment Due Process Claim is Legally Deficient.

Plaintiff's due process claim does not rise above the speculative level to the realm of plausibility and thus, should be dismissed.

As an initial matter, Plaintiffs' due process claim fails to meet the applicable pleading standard described in *Twombly* and *Iqbal*. Here, the same allegations that support Plaintiffs' APA claims are the same allegations that support their due process claim and Plaintiff neither identifies whether their procedural or substantive due process rights were violated nor plead sufficient facts that could give rise to an inference of a violation. *See* Am Compl. (ECF No 8) ¶¶ 48–55. This is

insufficient to substantiate a claim for a due process violation.  *See Iqbal*, 556 U.S. at 678 ("A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do."); *Kowal v. MCI Comm. Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994) ("[T]he court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint . . . [n]or must the court accept legal conclusions cast in the form of factual allegations.").

In any event, any procedural due process claim fails.  A "procedural due process violation occurs when an official deprives an individual of a liberty or property interest without providing appropriate procedural protections." *Atherton v. D.C. Off. of the Mayor*, 567 F.3d 672, 689 (D.C. Cir. 2009).  "At a minimum, a procedural due process claim 'requires the plaintiff to identify the process that is due.'" *Medina v. Dist. of Columbia*, 517 F. Supp. 2d 272, 281 (D.D.C. 2007) (quoting *Doe v. Dist. of Columbia*, 93 F.3d 861, 870 (D.C. Cir. 1996)); *see also Elkins v. Dist. of Columbia*, 690 F.3d 554, 561 (D.C. Cir. 2012) ("To state a procedural due process claim, a complaint must suggest 'what sort of process is due.'").  Plaintiffs' Amended Complaint, however, is devoid of any allegations asserting what process or procedures they were due but was not granted.  Instead, their allegations regarding the alleged due process violation consist solely of conclusory assertions that "providing Plaintiffs with prior notice and a realistic opportunity to cure would be a substantially more valuable procedure than summarily suspending Plaintiffs without any explanation," Am. Compl. (ECF No. 8) ¶ 53, and that they were deprived of property, *id.* ¶ 55.  These bare-bones allegations do not meet the threshold requirement of identifying the process that is due and thus, dismissal is warranted.  *See Gonzalez Boisson v. Pompeo*, 459 F. Supp. 3d 7, 19 (D.D.C. 2020) (dismissing plaintiff's due process claim where "the only allegations in [the plaintiff's] complaint regarding [the due process] argument [were] ... 'that the lack of fair and

meaningful post-deprivation procedures for adjudicating the revocation of a United States passport' violates the Due Process Clause."); *Lewis v. Gov't of the D.C.*, 161 F. Supp. 3d 15, 30–31 (D.D.C. 2015) (dismissing plaintiff's due process claims "[b]ecause [the complaint] is devoid of allegations as to the actual process purportedly denied ...the [complaint] does not raise [plaintiff's] procedural due process claim 'above the speculative level' to the realm of plausibility."). Also, here, the agency gave Plaintiffs the rationale for the temporary suspension and the agency's regulations are clear as far as the procedure going forward.

Similarly, any claim for substantive due process violation also fails. A "substantive due process constrains only egregious government misconduct," *Decatur Liquors v. Dist. of Columbia*, 478 F.3d 360, 363 (D.C. Cir. 2007). Thus, "a substantive due process violation will only occur where the government's conduct is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience," *Toms v. Off. of the Architect of the Capitol*, 650 F. Supp. 2d 11, 25–27 (D.D.C. 2009) (quoting *Butera v. Dist. of Columbia*, 235 F.3d 637, 651 (D.C. Cir. 2001)). Plaintiffs' mere complaints about the suspension not going the way they wanted does not rise to any level of "egregious government misconduct." Compl. ¶¶ 32, 40; *see also Toms*, 650 F. Supp. 2d at 25–27 (finding that "plaintiff's perceived procedural deficiencies" did not constitute a due process violation); *Solomon v. Off. of the Architect of the Capitol*, 539 F. Supp. 2d 347, 350-51 (D.D.C. 2008) (dismissing substantive due process claim, as procedural issue did not meet "conscience-shocking" test).

*    *    *

Accordingly, the Court should dismiss Plaintiffs' Amended Complaint in its entirety because of lack of jurisdiction and Plaintiffs' failure to state a claim.

- 32 -

**III.    Even If the Court Does Not Dismiss This Lawsuit, Plaintiffs Are Not Entitled to a Temporary Restraining Order or Preliminary Injunction.**

Courts cannot grant requests for sweeping mandatory injunctive relief absent a strong showing that all elements of the preliminary injunction standard have been met, namely that Plaintiffs demonstrate: (1) likely success on the merits; (2) likely irreparable harm in the absence of preliminary relief; (3) a balance of the equities in its favor; and (4) accord with the public interest.  As discussed previously, Plaintiffs cannot establish that the Court has jurisdiction, let alone demonstrate that it will prevail on the merits.  Also, Plaintiffs are unable to demonstrate immediate irreparable harm.  Further, Plaintiffs do not seek to preserve the status quo, but instead wants to alter it by enjoining Defendants from protecting consumers' PII and the Exchanges from being compromised or harmed.  Finally, the public interest tips against issuance of an injunction since Plaintiffs have not met at least the first two prongs for injunctive relief.

**A.  Plaintiffs Have Not Established Irreparable Injury**

The standard for irreparable harm is particularly high in the D.C. Circuit. "[P]roving irreparable injury is a considerable burden, requiring proof that the movant's injury is *certain, great and actual*—not theoretical—and *imminent,* creating a clear and present need for extraordinary equitable relief to prevent harm." *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)) (internal quotation marks omitted) (emphasis in original); *see also Save Jobs USA v. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 112-13 (D.D.C. 2015).

Also, purely economic loss, even when large sums of money are involved, typically will not constitute irreparable injury.  *See Wis. Gas Co.*, 758 F.2d at 674 (noting it is "well settled that economic loss does not in and of itself constitute irreparable harm"); *Emily's List v. FEC*, 362 F. Supp. 2d 43, 52 (D.D.C. 2005).  Recoverable monetary loss may constitute irreparable harm only

where the loss threatens the very existence of the movant's business. *See Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 n. 2 (D.C. Cir. 1977). The movant may not rely on "bare allegations" that the business will not survive absent a preliminary injunction. *Wis. Gas Co.*, 758 F.2 at 674. Instead, the movant must provide some evidence of irreparable harm: "the movant [must] substantiate the claim that irreparable injury is likely to occur" and "provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future." *Id.* at 674 (internal quotation marks and citation omitted). This is because "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

In addition, "the certain and immediate harm that a movant alleges must also be truly irreparable in the sense that it is 'beyond remediation.'" *Elec. Privacy Info. Ctr. v. Dep't of Just.* 15 F. Supp. 3d 32, 44 (D.D.C. 2014) (citation omitted). The movant must provide some evidence of irreparable harm: "the movant [must] substantiate the claim that irreparable injury is likely to occur" and "provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future." *Wis. Gas Co.*, 758 F.2d at 674 (internal quotation marks and citation omitted). This is because "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. As these authorities make clear, to meet the standard for irreparable harm the movant must present sufficient evidence that the purported injury is certain, great, actual, imminent, and beyond remediation.

Plaintiffs have not shown that it will suffer an "irreparable" injury absent a preliminary injunction. Plaintiffs argue that their business has come to a halt, some of their clients have terminated their relationship with the business, and the suspensions threatens their revenue. *See* Pls.' Mot. (ECF No. 9) at 20–21. In terms of the financial loss, while it may harm Plaintiffs, it is neither certain nor irreparable. Instead, it is a purely a financial injury, which Plaintiffs can avoid by earning revenue through their other business. Also, because the loss Plaintiffs have identified is for the most part financial, it cannot support a finding of irreparable harm unless Plaintiff establishes that these losses will indeed threaten the continued existence of its businesses. Plaintiff has not substantiated those claims. First, the fact that Plaintiff remains solvent and operational belies any suggestion that absent an injunction Plaintiffs' ability to continue operations will be immediately affected. Second, Plaintiff has offered only bare allegations that absent an injunction Plaintiff's business will not survive or will be competitively disadvantaged. Plaintiff has not submitted audited financial statements or other detailed materials to demonstrate the impact the injunction would have on its viability, the dollar deficit that would allegedly drive them out of business, or any details on the client relationships that have been severed. These "bare allegations" that absent an injunction Plaintiffs will have on-going loss or their business will be harmed in some indefinite time in the future is insufficient to support a finding of irreparable harm. *See Wis. Gas Co.*, 758 F.2d at 654. Thus, it is far from certain that the suspension will cause Plaintiffs' business to reach a financial deficit so high that Plaintiffs would be driven out of business or suffer irreparable harm. Again, Plaintiff can avoid that result by focusing on their other business enterprises, using the other available enrollment avenues to provide assistance to Exchange consumers, and therefore the alleged threat to its viability will result from Plaintiffs' decision not to elect other available options.

- 35 -

Even if Plaintiffs' fears of lost revenue were sufficiently imminent, or otherwise met the high standard, Plaintiffs have not shown that such injuries— if they occur at all—are irreparable. CMS has suspended Plaintiffs before. Wu Dec. ¶ 5, submitted herewith. Given that Plaintiffs have survived a past suspension by CMS, it appears highly speculative to claim that this most recent suspension will lead to them losing their business altogether. In addition, Plaintiffs' direct enrollment platforms and participation in the Exchanges are not their only business enterprise. Further, the suspension only affects plans purchased through the Exchanges and should not have any effect on Plaintiffs' other businesses. *See* Grant Decl. ¶ 11 ("If a consumer purchased non-ACA coverage through the [Plaintiffs'] they should still be able to do so, as they do not require a connection to the [Exchanges]."); *id.* ¶ 10 ("Agents, brokers, an agencies, including TrueCoverage's agents, will continue to be able to serve consumers, even while BenefitAlign and TrueCoverage platforms are suspended.").

Plaintiffs assert "[t]he CMS suspension threatens practically all of the revenue generated by TrueCoverage and Benefitalign." Pls.' Mot. (ECF No. 9) at 24. Such a claim is not borne out by the suspension CMS has imposed thus far. Plaintiffs ignore that CMS's suspension is narrowly tailored to specifically address its concerns and to protect the Exchanges and consumers from serious harm. The suspension only prevents Plaintiffs from accessing highly sensitive information available through the Exchanges that could be misused and improperly exposed, but the suspension does not prevent Plaintiffs from conducting other business. During the current suspension, Plaintiffs' Exchange agreements with CMS have not been suspended or terminated, which allows them to continue to assist Exchange consumers using other enrollment avenues and still earn commissions and other compensation for Exchange enrollments. *See* Grant Dec. ¶¶ 10-11. It also does not in any way interfere with Plaintiffs' non-Exchange activities and other lines of business

- 36 -

(e.g., dental plans, vision plans, etc.).  Plaintiffs have the ability to conduct all of these activities and continue to participate in these other lines of business, which they can and do provide.  While the suspension may be inconvenient, it is necessary to protect the privacy and security of innocent consumers' data and CMS information technology systems from harmful practices. And Plaintiffs have been unable to propose any action short of a suspension that will address CMS's concerns during the suspension period and accompanying audit.  *See* Pls.' Ex. 2 (ECF No. 9-2); Pls.' Ex. 3 (ECF No. 9-3). Plaintiffs will continue to be able to serve consumers, except they will not have direct access to the Exchanges' information technology systems, and they cannot make their direct enrollment platforms available to other entities to transact information with the Exchanges.

According to CMS's records, which identify the other entities approved to use Plaintiff Benefitalign's EDE platform, Benefitalign has only one upstream EDE entity, other than TrueCoverage.  This one other additional company is AvMed Health Plans, which, according to CMS records, accounted for only twenty-eight enrollments.  Respectfully, this hardly seems to be the number of enrollments that would make or break a business.  Plaintiffs assert, as part of their irreparable harm argument, that "health insurance carriers, such as AvMed Health Plans, that use [Plaintiffs'] platforms and whose operations are severely affected by the suspension of these platforms."  Pls.' Mot. (ECF No. 9) at 25.  AvMed Health Plans is not a party to this litigation and the Court has no obligation to consider Plaintiffs' claims about the effect on a third-party business that is not in this lawsuit.  Moreover, it is unclear what prevents AvMed from using any of the multitude of other available platforms to conduct its business on the Exchanges.  The theoretical nature of this harm, coupled with the fact it relates to a relatively small number of enrollments (twenty-eight), falls far short of the burden of irreparable harm that can support emergency relief.

Plaintiffs speculate about a series of "cascading" harm that will befall them, including "brokers and carriers' imminent termination of their relationships with [Plaintiffs]."   But Plaintiffs have failed to establish a "certain[] impending" injury when the asserted injury is based on a "speculative chain of possibilities," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013), or on "speculation about the decisions of independent actors," *id.* at 414.   As the D.C. Circuit has cautioned: "Because of the generally contingent nature of predictions of future third-party action," a court should be "sparing in crediting claims of anticipated injury by market actors and other parties alike." *Arpaio v. Obama*, 797 F.3d 11, 23 (D.C. Cir. 2015).

The suspension does not prevent Plaintiffs from accessing other available enrollment avenues to assist consumers with submitting applications and enrollments to the Exchanges. According to CMS's records, TrueCoverage has more than 50 registered agents, and TrueCoverage can still collect commissions and other compensation from insurance issuers notwithstanding the suspension and can also assist consumers with submitting applications and enrollments to the Exchanges by accessing other available enrollment avenues. Plaintiffs may also receive commissions from applications and enrollments submitted on or before the August 8th suspension.

Plaintiffs' main complaint is the suspension prevents BenefitAlign from collecting fees from issuers to be listed on its platform.  BenefitAlign charges per member annual fees.  We are unsure how this suspension prevents them from collecting fees.  TrueCoverage can still receive commissions and other compensation from issuers for enrolling consumers in Exchange coverage before the suspensions.  The suspension also has not impact on other lines of business, such as the non-Exchange coverage that TrueCoverage engages in – those activities can continue uninterrupted.

For all these reasons, Plaintiffs failed to demonstrate irreparable harm, which is fatal to their motion seeking emergency, preliminary relief.

### B. Plaintiffs Are Unlikely to Succeed on the Merits.

Plaintiffs likewise have not shown that they are likely to prevail on the merits of their claims. A plaintiff that cannot demonstrate a significant likelihood of success on the merits has no hope of obtaining a preliminary injunction. *See Trudeau v. Federal Trade Comm'n*, 456 F.3d 178, 182 n.2 (D.C. Cir. 2006); *Katz v. Georgetown Uni.*, 246 F.3d 685, 688 (D.C. Cir. 2001); *Apex, Inc. v. FDA*, 449 F.3d 1249, 1253–54 (D.C. Cir. 2006). "[A]bsent a 'substantial indication' of likelihood of success on the merits, 'there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review.'" *Biovail Corp. v. FDA*, 448 F. Supp. 2d 154, (D.D.C. 2006) (quoting *American Bankers Ass'n v. Nat'l Credit Union Admin.*, 38 F. Supp. 2d 114, 140 (D.D.C. 1999)). As discussed in great length above, Plaintiff is unlikely to succeed on the merits for a multitude of reasons. First, the Court lacks jurisdiction over Plaintiffs' claims because any challenges relating to the August 8 Email are moot, any challenges relating to the suspension are not ripe, and there are no allegations to establish subject matter jurisdiction under 8 U.S.C. §§ 2201, 1361, and 1346. Second, Plaintiff failed to state a claim because there is no agency decision, the suspension was authorized under Defendants' regulations and the agreements between the parties, and Plaintiffs failed to plead a cognizable due process claim. Thus, Plaintiffs have no likelihood of prevailing in this matter.

### C. The Remaining Factors Weigh Against Mandatory Injunction.

The final two factors required for preliminary injunctive relief—a balancing of the harm to the opposing party, and the public interest—merge when the Government is the opposing party. *See, e.g.*, *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Colo. Wild Horse v. Jewell*, 130 F. Supp. 3d 205, 220-21 (D.D.C. 2015). Courts must "[give] particular regard [to] the public consequences in

employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312-13 (1982).  In this case, the balance of equities and the public interest tip strongly in favor of the Government as "the public interest favors applying federal law correctly." *Small v. Avanti Health Sys, LLC*, 661 F.3d 1180, 1197 (9th Cir. 2011).

CMS's suspension of Plaintiffs' access to the Exchanges and the ability of other agents and brokers to use the Plaintiffs' platforms to transact information with the Exchange during the suspension and audit period protects the privacy and security of Exchange consumers' data and CMS information technology systems, as well as the integrity of the Exchanges.  In addition, with respect to the public interest there is no generalized loss of access to the Exchanges for consumers, brokers, or agents.  *See* Grant Decl. ¶ 10 ("Agents, brokers, and agencies will continue to be able to serve consumers, even while [Plaintiffs'] platforms are suspended. Unless contractually restricted, agents and brokers generally can affiliate with multiple insurance agencies simultaneously.").  Thus, for the public and those serving Exchange consumers, the suspension poses no significant adverse consequences—only protection.  *See id.* ¶ 11 ("consumers can turn to the … Exchange Call Center for support. The [] Call Center can access the applications and enrollments of all consumers enrolled through the Exchanges, regardless of whether the enrollment was submitted by an active or suspended EDE partner."); *id*. ¶ 12 ("Consumers' health insurance coverage and access to care will be unaffected by [Plaintiffs'] suspensions."); *see* Wu Decl. ¶ 4 (In Plan Year 2023, there were registered and approved 11 enhanced direct enrollment platforms, 12 web-brokers, numerous health insurance agencies, and around 79,795 independent agents and brokers).  Any inconvenience the suspension imposes on Plaintiffs or other entities that use Plaintiffs' direct enrollment platforms is thus far outweighed by the need to protect the public and

- 40 -

CMS information technology systems until CMS completes its audit and determines the extent of any harm.

Notwithstanding the foregoing, Plaintiffs cannot meet their burden of establishing "that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20; *Texas v. United States*, 86 F. Supp. 3d 591, 675 (S.D. Tex.), *aff'd*, 809 F.3d 134 (5th Cir. 2015) as revised (Nov. 25, 2015) (citation omitted) ("If no public interest supports granting preliminary relief, [it] should ordinarily be denied ...."); *see also Weinberger*, 456 U.S. at 312 ("[C]ourts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."). Here, the public interest weighs heavily against Plaintiffs' attempt to enjoin CMS's suspension, which the agency intends to maintain pending the audit to protect the public and CMS information technology systems.

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' Motion, grant Defendants' Motion, and dismiss this action.

Dated: September 20, 2024

Respectfully submitted,

MATTHEW M. GRAVES, D.C. Bar # 481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By:        */s/ Stephanie R. Johnson*
STEPHANIE R. JOHNSON
DC Bar # 1632338
Assistant United States Attorney
601 D Street, NW
Washington, DC 20530
(202) 252-7874
Stephanie.Johnson5@usdoj.gov

*Attorneys for the United States of America*